1  DARRYL M. WOO (CSB No. 100513)
   E-Mail: dwoo@fenwick.com
2  ROBERT R. SACHS (CSB No. 148489)
   E-Mail: msachs@fenwick.com
3  HEATHER N. MEWES (CSB No. 203690)
   E-Mail: hmewes@fenwick.com
4  CAROLYN C. CHANG (CSB No. 217933)
   E-Mail: cchang@fenwick.com
5  MASHHOOD RASSAM (CSB No. 240834)
   E-Mail: mrassam@fenwick.com
6  FENWICK & WEST LLP
   555 California Street
7  San Francisco, CA 94104
   Telephone:   (415) 875-2300
8  Facsimile:   (415) 281-1350

9  Attorneys for Defendants and
   Counterclaimants
10 MAGNA ENTERTAINMENT CORP.,
   HRTV, LLC, and XPRESSBET, INC.

11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14                   WESTERN DIVISION

15                                              **BY FAX**

16
   ODS TECHNOLOGIES, L.P., d/b/a        Case No. CV 07-03265 DDP (RCX)
17 TVG NETWORK, a Delaware
   limited partnership,                 **ANSWER TO FIRST AMENDED
18                                       COMPLAINT, AFFIRMATIVE
              Plaintiff,                 DEFENSES AND
19                                       COUNTERCLAIMS**
       v.
20                                       **JURY TRIAL DEMANDED**
   MAGNA ENTERTAINMENT
21 CORPORATION, a Delaware
   corporation; and HRTV, LLC., a
22 Delaware limited liability company;
   XPRESSBET, INC., a Delaware
23 corporation,

24            Defendants.

25

26

27

28

DEFENDANTS' ANSWER TO FIRST              CASE NO. CV 07-03265 DDP (RCX)
AMENDED COMPLAINT

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Defendants MAGNA ENTERTAINMENT CORP., HRTV, LLC, and

2   XPRESSBET, INC. (collectively, "Defendants"), by their attorneys, Fenwick &

3   West LLP, for their Answer to the First Amended Complaint of ODS

4   TECHNOLOGIES, L.P. d/b/a TVG NETWORK ("Plaintiff" or "ODS/TVG"),

5   answer and allege as follows:

6                    I.     ANSWER

7                    The Parties

8        1.      Defendants are without information sufficient to admit or deny the

9   allegations in paragraph 1 of the First Amended Complaint, and accordingly deny

10  them.

11       2.      In answer to paragraph 2 of the First Amended Complaint, Defendants

12  admit that Defendant Magna Entertainment Corp. ("MEC"), sued herein as "Magna

13  Entertainment Corporation," is a corporation organized and existing under the laws

14  of the state of Delaware with its principal place of business in Ontario, Canada.

15       3.      In answer to paragraph 3 of the First Amended Complaint, Defendants

16  admit that Defendant HRTV, LLC ("HRTV") is a limited liability corporation

17  organized and existing under the laws of Delaware with a place of business in

18  Arcadia, California.  Defendants admit that MEC owns 50% of HRTV.  Except as

19  expressly admitted or averred, Defendants deny the remaining allegations of this

20  paragraph.

21       4.      In answer to paragraph 4 of the First Amended Complaint, Defendants

22  admit that Defendant XpressBet, Inc. ("XpressBet") is a corporation organized and

23  existing under the laws of the state of Delaware with its principal place of business

24  in Washington, Pennsylvania.  Defendants admit that XpressBet is a wholly-owned

25  subsidiary of MEC.  Except as expressly admitted or averred, Defendants deny the

26  remaining allegations of this paragraph.

27                    Jurisdiction and Venue

28       5.      In answer to Paragraph 5 of the First Amended Complaint, Defendants

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  admit that the First Amended Complaint purports to allege a claim for patent

2  infringement under 35 U.S.C § 1, *et seq.*  Defendants admit that this Court has

3  subject matter jurisdiction over claims for patent infringement under 28 U.S.C. §§

4  1338(a) and 1331.  Except as expressly admitted, Defendants deny the remaining

5  allegations of this paragraph.

6      **6.**   In answer to Paragraph 6 of the First Amended Complaint, Defendants

7  admit venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

8      **7.**   In answer to paragraph 7 of the First Amended Complaint, Defendants

9  admit that they are subject to personal jurisdiction in this Court.  Defendants admit

10  that MEC owns Santa Anita Park in Arcadia, California, and Golden Gate Fields in

11  Albany, California.  Defendants deny that HRTV has its principle place of business

12  in Valencia, California, and aver that HRTV has a place of business in Arcadia,

13  California.  Defendants admit that XpressBet holds such licenses as are required by

14  the State of California to operate its business in California.  Except as expressly

15  admitted, Defendants deny the remaining allegations of this paragraph.  As to the

16  last sentence of this paragraph, Defendants lack knowledge or information

17  sufficient to admit or deny these allegations, and accordingly deny them.

18              **Patents-In-Suit**

19      **8.**   Defendants admit that Exhibit A of the First Amended Complaint

20  purports to be a copy of U.S. Patent No. 6,089,981 ("the '981 Patent").  Defendants

21  admit that the '981 Patent is entitled "Interactive Wagering Systems and

22  Processes," and on its face purports to have issued on July 18, 2000 to Brenner et

23  al.  Defendants lack knowledge or information sufficient to admit or deny the

24  allegations in Paragraph 8 of the First Amended Complaint regarding ownership of

25  the '981 Patent, and accordingly deny them.  Except as expressly admitted,

26  Defendants deny the remaining allegations of this paragraph.

27      **9.**   Defendants admit that Exhibit B of the First Amended Complaint

28  purports to be a copy of U.S. Patent No. 6,554,709 ("the '709 Patent").  Defendants

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  admit that the '709 Patent is entitled "Interactive Wagering Systems and
2  Processes," and on its face purports to have issued on April 29, 2003 to Brenner et
3  al.  Defendants lack knowledge or information sufficient to admit or deny the
4  allegations in Paragraph 9 of the First Amended Complaint regarding ownership of
5  the '709 Patent, and accordingly deny them.  Except as expressly admitted,
6  Defendants deny the remaining allegations of this paragraph.

7      **10.**    Defendants admit that Exhibit C of the First Amended Complaint
8  purports to be a copy of U.S. Patent No. 5,830,068 ("the '068 Patent").  Defendants
9  admit that the '068 Patent is entitled "Interactive Wagering Systems and
10  Processes," and on its face purports to have issued on November 3, 1998 to Brenner
11  et al.  Defendants lack knowledge or information sufficient to admit or deny the
12  allegations in Paragraph 10 of the First Amended Complaint regarding ownership
13  of the '068 Patent, and accordingly deny them.  Except as expressly admitted,
14  Defendants deny the remaining allegations of this paragraph.

15      **11.**    Defendants admit that Exhibit D of the First Amended Complaint
16  purports to be a copy of U.S. Patent No. 6,004,211 ("the '211 Patent").  Defendants
17  admit that the '211 Patent is entitled "Interactive Wagering Systems and
18  Processes," and on its face purports to have issued on December 21, 1999 to
19  Brenner et al.  Defendants lack knowledge or information sufficient to admit or
20  deny the allegations in Paragraph 11 of the First Amended Complaint regarding
21  ownership of the '211 Patent, and accordingly deny them.  Except as expressly
22  admitted, Defendants deny the remaining allegations of this paragraph.

23      **12.**    Defendants admit that Exhibit E of the First Amended Complaint
24  purports to be a copy of U.S. Patent No. 7,229,354 ("the '354 Patent").  Defendants
25  admit that the '354 Patent is entitled "Interactive Wagering Systems and Methods
26  for Restricting Wagering Access," and on its face purports to have issued on
27  June 12, 2007 to McNutt et al.  Defendants lack knowledge or information
28  sufficient to admit or deny the allegations in Paragraph 12 of the First Amended

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Complaint regarding ownership of the '354 Patent, and accordingly deny them.

2    Except as expressly admitted, Defendants deny the remaining allegations of this

3    paragraph.

4    ### Defendants' XpressBet and HRTV Systems

5        13.    In answer to paragraph 13 of the First Amended Complaint, MEC and

6    XpressBet admit that they began marketing audiovisual and wagering services

7    under the brand name "XpressBet" in this District and other parts of the United

8    States since on or about January of 2002.  MEC and HRTV began marketing

9    audiovisual services under the brand name "HRTV" in this District and other parts

10   of the United States since on or about July of 2002.  Except as expressly admitted,

11   Defendants deny the remaining allegations of this paragraph.

12   ### First Claim for Relief

13   ### U.S. Patent No. 6,089,981

14       14.    Defendants incorporate by reference their responses to Paragraphs 1

15   through 13, as though fully set forth herein.

16       15.    Defendants deny the allegations in paragraph 15 of the First Amended

17   Complaint.

18       16.    Defendants deny the allegations in paragraph 16 of the First Amended

19   Complaint.

20       17.    Defendants deny the allegations in paragraph 17 of the First Amended

21   Complaint.

22       18.    Defendants deny the allegations in paragraph 18 of the First Amended

23   Complaint.

24       19.    Defendants deny the allegations in paragraph 19 of the First Amended

25   Complaint.

26   ### Second Claim for Relief

27   ### U.S. Patent No. 6,554,709

28       20.    Defendants incorporate by reference their responses to Paragraphs 1

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FIRST                    4                    CASE NO. CV 07-03265 DDP (RCX)
AMENDED COMPLAINT

1  through 19, as though fully set forth herein.

2      **21.**    Defendants deny the allegations in paragraph 21 of the First Amended

3  Complaint.

4      **22.**    Defendants deny the allegations in paragraph 22 of the First Amended

5  Complaint.

6      **23.**    Defendants deny the allegations in paragraph 23 of the First Amended

7  Complaint.

8      **24.**    Defendants deny the allegations in paragraph 24 of the First Amended

9  Complaint.

10      **25.**    Defendants deny the allegations in paragraph 25 of the First Amended

11  Complaint.

12  <center>**Third Claim for Relief**</center>

13  <center>**U.S. Patent No. 5,830,068**</center>

14      **26.**    Defendants incorporate by reference their responses to Paragraphs 1

15  through 25, as though fully set forth herein.

16      **27.**    Defendants deny the allegations in paragraph 27 of the First Amended

17  Complaint.

18      **28.**    Defendants deny the allegations in paragraph 28 of the First Amended

19  Complaint.

20      **29.**    Defendants deny the allegations in paragraph 29 of the First Amended

21  Complaint.

22      **30.**    Defendants deny the allegations in paragraph 30 of the First Amended

23  Complaint.

24      **31.**    Defendants deny the allegations in paragraph 31 of the First Amended

25  Complaint.

26  <center>**Fourth Claim for Relief**</center>

27  <center>**U.S. Patent No. 6,004,211**</center>

28      **32.**    Defendants incorporate by reference their responses to Paragraphs 1

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   through 31, as though fully set forth herein.

2      **33.**   Defendants deny the allegations in paragraph 33 of the First Amended
3   Complaint.

4      **34.**   Defendants deny the allegations in paragraph 34 of the First Amended
5   Complaint.

6      **35.**   Defendants deny the allegations in paragraph 35 of the First Amended
7   Complaint.

8      **36.**   Defendants deny the allegations in paragraph 36 of the First Amended
9   Complaint.

10      **37.**   Defendants deny the allegations in paragraph 37 of the First Amended
11   Complaint.

12                     **Fifth Claim for Relief**
13                  **U.S. Patent No. 7,229,354**

14      **38.**   Defendants incorporate by reference their responses to Paragraphs 1
15   through 37, as though fully set forth herein.

16      **39.**   Defendants deny the allegations in paragraph 39 of the First Amended
17   Complaint.

18      **40.**   Defendants deny the allegations in paragraph 40 of the First Amended
19   Complaint.

20      **41.**   Defendants deny the allegations in paragraph 41 of the First Amended
21   Complaint.

22            **II.   AFFIRMATIVE DEFENSES**
23      **First Affirmative Defense: Failure to State a Cause of Action**

24      **42.**   The First Amended Complaint fails to state a cause of action against
25   the Defendants for which relief can be granted.

26      **Second Affirmative Defense: Non-Infringement of the '981 Patent**
27      **43.**   Plaintiff is not entitled to any relief against Defendants because
28   Defendants are not infringing and have not infringed the '981 Patent.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    **44.**    Plaintiff is not entitled to any relief against Defendants because
2    Defendants do not contributorily infringe and have not contributorily infringed the
3    '981 Patent.

4    **45.**    Plaintiff is not entitled to any relief against Defendants because
5    Defendants do not induce and have not induced infringement of the '981 Patent.

6    **<u>Third Affirmative Defense: Non-Infringement of the '709 Patent</u>**

7    **46.**    Plaintiff is not entitled to any relief against Defendants because
8    Defendants are not infringing and have not infringed the '709 Patent.

9    **47.**    Plaintiff is not entitled to any relief against Defendants because
10   Defendants do not contributorily infringe and have not contributorily infringed the
11   '709 Patent.

12   **48.**    Plaintiff is not entitled to any relief against Defendants because
13   Defendants do not induce and have not induced infringement of the '709 Patent.

14   **<u>Fourth Affirmative Defense: Non-Infringement of the '068 Patent</u>**

15   **49.**    Plaintiff is not entitled to any relief against Defendants because
16   Defendants are not infringing and have not infringed the '068 Patent.

17   **50.**    Plaintiff is not entitled to any relief against Defendants because
18   Defendants do not contributorily infringe and have not contributorily infringed the
19   '068 Patent.

20   **51.**    Plaintiff is not entitled to any relief against Defendants because
21   Defendants do not induce and have not induced infringement of the '068 Patent.

22   **<u>Fifth Affirmative Defense: Non-Infringement of the '211 Patent</u>**

23   **52.**    Plaintiff is not entitled to any relief against Defendants because
24   Defendants are not infringing and have not infringed the '211 Patent.

25   **53.**    Plaintiff is not entitled to any relief against Defendants because
26   Defendants do not contributorily infringe and have not contributorily infringed the
27   '211 Patent.

28   **54.**    Plaintiff is not entitled to any relief against Defendants because

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Defendants do not induce and have not induced infringement of the '211 Patent.

2   **Sixth Affirmative Defense: Non-Infringement of the '354 Patent**

3       **55.**    Plaintiff is not entitled to any relief against Defendants because

4   Defendants are not infringing and have not infringed the '354 Patent.

5       **56.**    Plaintiff is not entitled to any relief against Defendants because

6   Defendants do not contributorily infringe and have not contributorily infringed the

7   '354 Patent.

8       **57.**    Plaintiff is not entitled to any relief against Defendants because

9   Defendants do not induce and have not induced infringement of the '354 Patent.

10   **Seventh Affirmative Defense:  Invalidity of the '981 Patent**

11       **58.**    The claims of the '981 Patent are invalid for failure to satisfy one or

12   more of the Conditions for Patentability specified in 35 U.S.C. §§ 102, 103 and 112

13   because the alleged invention thereof was used or known by others in this country

14   or was patented or described by a publication before its invention; or was patented

15   or described in a publication or was in public use or for sale more than one year

16   before the date of the patent application; or was not invented by the named

17   inventors; or was invented by another prior to the alleged invention; or was taught

18   by, suggested by, and/or obvious in view of, the prior art; or is indefinite; or does

19   not contain a proper written description; or does not disclose the best mode of the

20   invention.

21   **Eighth Affirmative Defense: Invalidity of the '709 Patent**

22       **59.**    The claims of the '709 Patent are invalid for failure to satisfy one or

23   more of the Conditions for Patentability specified in 35 U.S.C. §§ 102, 103 and 112

24   because the alleged invention thereof was used or known by others in this country

25   or was patented or described by a publication before its invention; or was patented

26   or described in a publication or was in public use or for sale more than one year

27   before the date of the patent application; or was not invented by the named

28   inventors; or was invented by another prior to the alleged invention; or was taught

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FIRST
AMENDED COMPLAINT

8

CASE NO. CV 07-03265 DDP (RCX)

1   by, suggested by, and/or obvious in view of, the prior art; or is indefinite; or does

2   not contain a proper written description; or does not disclose the best mode of the

3   invention.

4   **Ninth Affirmative Defense: Invalidity of the '068 Patent**

5   **60.**   The claims of the '068 Patent are invalid for failure to satisfy one or

6   more of the Conditions for Patentability specified in 35 U.S.C. §§ 102, 103 and 112

7   because the alleged invention thereof was used or known by others in this country

8   or was patented or described by a publication before its invention; or was patented

9   or described in a publication or was in public use or for sale more than one year

10   before the date of the patent application; or was not invented by the named

11   inventors; or was invented by another prior to the alleged invention; or was taught

12   by, suggested by, and/or obvious in view of, the prior art; or is indefinite; or does

13   not contain a proper written description; or does not disclose the best mode of the

14   invention.

15   **Tenth Affirmative Defense: Invalidity of the '211 Patent**

16   **61.**   The claims of the '211 Patent are invalid for failure to satisfy one or

17   more of the Conditions for Patentability specified in 35 U.S.C. §§ 102, 103 and 112

18   because the alleged invention thereof was used or known by others in this country

19   or was patented or described by a publication before its invention; or was patented

20   or described in a publication or was in public use or for sale more than one year

21   before the date of the patent application; or was not invented by the named

22   inventors; or was invented by another prior to the alleged invention; or was taught

23   by, suggested by, and/or obvious in view of, the prior art; or is indefinite; or does

24   not contain a proper written description; or does not disclose the best mode of the

25   invention.

26   **Eleventh Affirmative Defense: Invalidity of the '354 Patent**

27   **62.**   The claims of the '354 Patent are invalid for failure to satisfy one or

28   more of the Conditions for Patentability specified in 35 U.S.C. §§ 102, 103 and 112

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  because the alleged invention thereof was used or known by others in this country

2  or was patented or described by a publication before its invention; or was patented

3  or described in a publication or was in public use or for sale more than one year

4  before the date of the patent application; or was not invented by the named

5  inventors; or was invented by another prior to the alleged invention; or was taught

6  by, suggested by, and/or obvious in view of, the prior art; or is indefinite; or does

7  not contain a proper written description; or does not disclose the best mode of the

8  invention.

9  **Twelveth Affirmative Defense: Laches and Estoppel**

10  **63.**  The purported claims for relief for the alleged infringement of the

11  '981, '709, '211, and '068 patents set forth in Plaintiff's First Amended Complaint

12  are barred by the doctrines of laches and estoppel.

13  **64.**  Plaintiff knew or should have known since January of 2002 that

14  Defendants were operating the wagering systems Plaintiff claims infringe the '981,

15  '709, '211, and '068 patents.

16  **65.**  Plaintiff's claims for relief for the alleged infringement of the '981,

17  '709, '211, and '068 patents as set forth in Plaintiff's First Amended Complaint

18  come after an unreasonable and inexcusable delay in filing suit.

19  **66.**  Defendants have reasonably but detrimentally relied on Plaintiff's

20  misleading silence.  Defendants have suffered material prejudice from Plaintiff's

21  delay, and will suffer material prejudice if Plaintiff is allowed to proceed with its

22  claim.

23  **Thirteenth Affirmative Defense: Inequitable Conduct**

24  **67.**  The '981 Patent is unenforceable for acts committed or the failure to

25  commit acts during the prosecution of the '981 Patent.

26  **68.**  The '709 Patent is unenforceable for acts committed or the failure to

27  commit acts during the prosecution of the '709 Patent.

28  ///

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# PROBE XL

69.   On December 7, 1993, more than one year before the earliest claimed priority date for the '981 and '709 patents, Autotote Corporation publicly announced the release of its then new PROBE XL terminal.  A copy of this announcement is attached as Exhibit A.

70.   Exhibit A is dated December 7, 1993, and discloses among other things the following:

a.   "AUTOTOTE CORPORATION (NASDAQ/NMS:TOTE) Tuesday unveiled the latest addition to its PROBE family of products – the interactive PROBE-XL multi-media terminal feature AUTOTOTE's new Screen Activated Machine ('SAM') software for pari-mutuel and video gaming."

b.   "The PROBE XL is a unique, technologically advanced, multi-functional video wagering terminal which enables customers to place their own pari-mutuel bets and play video wagering games.  The innovative features of the PROBE XL offer players and the facility management more wagering options than any other product on the market."

c.   "Using the PROBE XL, customers touch the screen to select wagering options on a full card of live and/or remote races, or choose from a library of the most popular video wagering games including black jack, keno, line games and a variety of poker games.  AUTOTOTE's PROBE XL is the only video gaming terminal to feature 'Picture-in Picture' displays so customers can watch broadcasted races and other images from multiple channels while continuing to wager.  In addition, the PROBE XL offers account betting (cashless), voucher and cash wagering."

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**d.**   "The physical attributes of the PROBE XL include: a 19-inch high resolution, full color, video monitor with Touch Screen; Picture-in-Picture displays; high-speed thermal or dual port impact printer; ATM-like magnetic card scanning and bill and coin acceptors; all encompassed in an ergonomically designed, user friendly terminal."

**e.**   "Many advantages are available for the first time with the PROBE XL including: providing additional wagering opportunities for customers between races; player tracking; cross market pari-mutuel wagering; tournament play; progressive jackpot capability with interactive customer communications and accounting; on-line/real-time communications; adaptable for future programming, customer recognition for special incentives, and multi-lingual text and voice instruction."

**71.**   The PROBE XL terminal was also publicly demonstrated by Autotote at the University of Arizona Symposium on Racing on December 9, 1993, more than one year before the earliest claimed priority date for the '981 and '709 patents. A copy of this announcement is attached as Exhibit B.

**72.**   Exhibit B is dated December 9, 1993, and discloses among other things the following:

**a.**   "AUTOTOTE CORPORATION (NASDAQ/NMS Symbol: TOTE) today announced that it introduced at the University of Arizona Symposium on Racing its new PROBE XL terminal."

**b.**   "The PROBE XL is an interactive multi-media terminal featuring AUTOTOTE's new Screen Activated Machine ('SAM') software for both pari-mutuel and video gaming."

**c.**   "The Probe XL is a unique, technologically advanced, multi-

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FIRST
AMENDED COMPLAINT                    12                    CASE NO. CV 07-03265 DDP (RCX)

functional video wagering terminal which enables customers to place their own pari-mutuel bets and play video wagering games. The innovative features of the PROBE XL offer players and the facility management more wagering options than any other product on the market. AUTOTOTE expects to install the PROBE XL at pari-mutuel facilities, Casinos, Riverboats and Native American Casinos."

d. "Using the PROBE XL, customers touch the screen to select wagering options on a full card of live and/or remote races, or choose from a library of the most popular video wagering games including black jack, keno, line games and a variety of poker games."

e. "AUTOTOTE's PROBE XL is the only video gaming terminal to feature 'Picture-in Picture' displays so customers can watch broadcasted races and other images from multiple channels while continuing to wager."

f. "In addition, the PROBE XL offers account betting (cashless), voucher and cash wagering."

73. The PROBE XL was an off-track wagering system.

74. The PROBE XL provided a user with the opportunity to place a wager on a given race that has not been run using a user terminal.

75. The PROBE XL also displayed a video of the given race using the user terminal.

76. The PROBE XL was highly material to the examination of the applications resulting in the '981 and '709 patents.

77. These patents include claims directed to an "off-track wagering system" which provides a user with an opportunity to place a wager on a given race that has not been run using a user terminal and displaying a video of the given race

1  on a monitor connected to the user terminal.

2  **78.** At least one of the named inventors or others substantially involved in

3  the prosecution of the applications resulting in the '981 and '709 patents was aware

4  of the PROBE XL, including its capability of providing a user with an opportunity

5  to place a wager on a given race that has not yet been run and displaying a video of

6  the given race on the same terminal. Furthermore, at least one of the named

7  inventors or others substantially involved in the prosecution of the applications

8  resulting in the '981 and '709 patents was aware that this system had been publicly

9  demonstrated as early as December 1993.

10  **79.** While a brochure describing some of the features of the PROBE XL

11  was submitted to the PTO in connection with prosecution of the '981 and '709

12  patents, the submitted brochure was undated.

13  **80.** The PROBE XL brochure was also submitted to the PTO in

14  connection with the prosecution of the '981 and '709 patents along with a large

15  number of other prior art references and no one specifically brought the brochure or

16  the PROBE XL to the attention of the patent examiner.

17  **81.** On information and belief, at least one of the named inventors or

18  others substantially involved in the prosecution of the applications resulting in the

19  '981 and '709 patents made this partial disclosure with the intent to deceive or

20  mislead the patent examiner.

21  **TRIPLES/GTE MAINSTREET SYSTEM**

22  **82.** At least as early as May 1992, more than one year before the earliest

23  claimed priority date for the '981 and '709 patents, NTN Communications publicly

24  demonstrated its cable-wagering game, called Triples. Triples was a horse racing

25  game played using GTE's Mainstreet system—an interactive TV cable-decoder

26  box. Triples was tested in 225 households in Cerritos, California in May 1992. It

27  was again tested in 3,500 households in Cerritos and in Carlsbad, California in

28  1993. It was also widely reported in the press. A copy of articles describing these

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    public demonstrations is attached as Exhibit C.

2        **83.**    The articles collectively attached as Exhibit C are dated August 27,

3    1992, October 18, 1992 and December 2, 1993 respectively, and disclose among

4    other things the following:

5        **a.**    "Following a successful test run of NTN'S "Triples,' an

6            interactive horse racing game on the GTE Mainstreet Service (a

7            subscriber-based cable channel that offers convenience services

8            such as banking, library references, shopping, etc. reachable via

9            the TV remote control), the California Federation of Racing

10           Associations Inc. has introduced legislation that would permit

11           interactive television wagering."

12       **b.**    "'Triples' has been running on Mainstreet since May [1992],

13           one evening a week, on Apollo Cable in Cerritos, Calif. Users

14           play with and for points, rather than dollars."

15       **c.**    "As proposed, NTN's Cable Wagering Service will allow

16           consumers to open an account with a race track. By using the

17           television remote control, a consumer will select the race, horse,

18           and wager on the interactive menu."

19       **d.**    "NTN currently is testing the cable-wagering game, called

20           Triples, in about 250 households in Cerritos, 15 miles southeast

21           of downtown Los Angeles."

22       **e.**    "Viewers see each horse during a pre-race program. Then they

23           key in numbers on a remote-control device to choose their horse

24           and the amount of the bet. Because cable wagering is not yet

25           legal, customers bet points instead of dollars."

26       **f.**    "Should cable betting become legal, bets would be covered by

27           money the customer deposited ahead of time into an account,

28           Downs said."

DEFENDANTS' ANSWER TO FIRST          15          CASE NO. CV 07-03265 DDP (RCX)
AMENDED COMPLAINT

g.    "In Southern California, Carlsbad-based NTN Communications, an international producer and broadcaster of interactive television games, has been testing a game called Triples, in which players try to predict the winners of live horse races."

h.    "The game – currently being played by about 3,500 cable TV subscribers in Cerritos and Carlsbad – uses a set of 'smart' equipment, including a cable decoder box and a remote channel changer. Players use the remote to pick horses displayed on the screen and win points for correct predictions."

84.    Triples was also disclosed publicly at the University of Arizona Symposium on Racing on December 9, 1992 and again on December 8, 1993. A copy of relevant excerpts from the transcripts for the Symposium on Racing for 1992 and 1993 is attached as Exhibits D and E, respectively, and disclose among other things the following:

a.    "We then came up with a – in conjunction with [NTN] Communications we came up with a game called Triples which GTE agreed to put on, and Triples is very simply a night at the races on Thursday night from Los Alamitos. And those 225 homes see the entire program, all the betting odds, just [as] they would if they were sitting at a satellite in Fresno."

b.    "They use their device, and each time they log on they get a hundred points. They use their device to play the game of Triples and they can wager any number from one to a hundred on each race. They simply pick a win horse, a place horse, a show horse, it's a very simple bet, too simple in some ways, and if any of those three come in you multiply the number of points that you have wagered times the payoff. We have prizes, we bring people to the track, to sit there and see this happen and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   realize that tomorrow, if we had the enabling legislation, we

2   could convert this to dollars.  It's very exciting."

3   c.   "Once you've confirmed your bet it's sent through your cable

4   system and the phone to the cable head end and then would go

5   directly into the track.  It would be a burst of data that quick.

6   You wouldn't be on line, you would be able to transmit the data

7   through smart cards, through credit cards."

8   d.   "I'd like to show you an early version, not the version we have

9   today, but an early version of a cable wagering system that we

10   are developing as we speak…. [A consumer] will use this

11   remote control.  And he'll be watching the races live on TV and

12   decide he wants to make a wager…. He'll enter his code using a

13   remote control, using his own television in his own house, and

14   he will select, he'll open his account and he'll start making a

15   wager…. $20, big player here.  Selected his horses.  He's going

16   to okay the bet, and he's going to send it to the track.  This will

17   be done on the television.  The little display on the far right

18   there is meaning that the – this race is interactive.  So the race

19   track sends back the information and he's ready to – to – move

20   on and watch the race or make another bet."

21   **85.**   The GTE Main Street system with Triples was an off-track wagering

22   system designed for use in a user's home.

23   **86.**   The GTE Main Street system with Triples provided a user with an

24   opportunity to place a wager on a given race that had not been run using a user

25   terminal.

26   **87.**   The GTE Main Street system with Triples displayed a video of the

27   given race using the user terminal.

28   **88.**   Because cable wagering was not yet legal at the time, Triples

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    customers bet with and for points instead of dollars.  However, the developers of

2    Triples disclosed that as soon as "we ha[ve] enabling legislation, we could convert

3    this to dollars."

4         **89.**    Triples was highly material to the examination of the applications

5    resulting in the '981 and '709 patents.

6         **90.**    These patents include claims directed to an "off-track wagering

7    system" which provides a user with an opportunity to place a wager on a given race

8    that has not been run using a user terminal and displaying a video of the given race

9    on a monitor connected to the user terminal.

10        **91.**    On information and belief, at least one of the named inventors or

11   others substantially involved in the prosecution of the applications resulting in the

12   '981 and '709 patents was aware of the GTE Main Street system with Triples,

13   including its capability of providing a user with an opportunity to place a wager on

14   a given race that has not yet been run and displaying a video of the given race on

15   the same terminal.

16        **92.**    The GTE Main Street system with Triples was not disclosed to the

17   PTO in connection with prosecution of the '981 and '709 patents.

18        **93.**    On information and belief, at least one of the named inventors or

19   others substantially involved in the prosecution of the applications resulting in the

20   '981 and '709 patents did not disclose Triples or the NTN Communications system

21   with the intent to deceive or mislead the patent examiner.

22              **III.    COUNTERCLAIMS**

23        In addition to their affirmative defenses, Defendants further assert the

24   following counterclaims against Plaintiff ODS/TVG:

25              **The Parties**

26        **94.**    Defendant and Counterclaimant MEC is a corporation organized and

27   existing under the laws of the state of Delaware, with its headquarters at 337 Magna

28   Drive, Aurora, Ontario, Canada.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

95.     Defendant and Counterclaimant HRTV is a limited liability company organized and existing under the laws of the state of Delaware, with a place of business at 285 W. Huntington Drive, Arcadia, CA 91007.

96.     Defendant and Counterclaimant XpressBet is corporation organized and existing under the laws of the state of Delaware, with a place of business in Washington, Pennsylvania.

97.     As alleged in the First Amended Complaint, Plaintiff and Counterclaim-defendant ODS/TVG is a Delaware corporation with its principal place of business at 67801 Center Drive West, Suite 160, Los Angeles, California 90045.

## Jurisdiction and Venue

98.     MEC, HRTV, and XpressBet counterclaim against ODS/TVG pursuant to the patent laws of the United States, Title 35 of the United States Code, with a specific remedy sought based upon the laws authorizing actions for declaratory judgment in the courts of the United States, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 13.

99.     This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201(a), and 2202.

100.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

101.    An actual controversy exists between Defendants and Plaintiff, by virtue of the allegations of Plaintiff's First Amended Complaint in this action and Defendants' Answer, as to whether the '981 and '709 patents are invalid, unenforceable, and not infringed by Defendants.  In addition, an actual controversy exists between Defendants and Plaintiff, by virtue of the allegations of Plaintiff's First Amended Complaint in this action and Defendants' Answer, as to whether the '068, '211 and '354 patents are invalid and not infringed by Defendants.

///

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

<div align="center"><b><u>First Counterclaim:</u></b></div>

2

<div align="center"><b><u>Declaratory Judgment of Non-Infringement of the '981 Patent</u></b></div>

3      **102.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

4   in paragraphs 94-101 above.

5      **103.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

6   have infringed or are infringing the '981 Patent.

7      **104.**   MEC, HRTV, and XpressBet have not, and are not infringing the '981

8   Patent.

9      **105.**   Accordingly, there is an actual case or controversy over Defendants'

10   non-infringement, and MEC, HRTV, and XpressBet seek a judgment holding that

11   they do not infringe and have not infringed, directly or indirectly, contributorily or

12   by inducement, any claim of the '981 Patent.

13

<div align="center"><b><u>Second Counterclaim:</u></b></div>

14

<div align="center"><b><u>Declaratory Judgment of Non-Infringement of the '709 Patent</u></b></div>

15      **106.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

16   in paragraphs 94-105 above.

17      **107.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

18   have infringed or are infringing the '709 Patent.

19      **108.**   MEC, HRTV, and XpressBet have not, and are not infringing the '709

20   Patent.

21      **109.**   Accordingly, there is an actual case or controversy over Defendants'

22   non-infringement, and MEC, HRTV, and XpressBet seek a judgment holding that

23   they do not infringe and have not infringed, directly or indirectly, contributorily or

24   by inducement, any claim of the '709 Patent.

25

<div align="center"><b><u>Third Counterclaim:</u></b></div>

26

<div align="center"><b><u>Declaratory Judgment of Non-Infringement of the '068 Patent</u></b></div>

27      **110.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

28   in paragraphs 94-109 above.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FIRST
AMENDED COMPLAINT                          20          CASE NO. CV 07-03265 DDP (RCX)

1    **111.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

2    have infringed or are infringing the '068 Patent.

3    **112.**   MEC, HRTV, and XpressBet have not, and are not infringing the '068

4    Patent.

5    **113.**   Accordingly, there is an actual case or controversy over Defendants'

6    non-infringement, and MEC, HRTV, and XpressBet seek a judgment holding that

7    they do not infringe and have not infringed, directly or indirectly, contributorily or

8    by inducement, any claim of the '068 Patent.

9                                    **Fourth Counterclaim:**

10   **Declaratory Judgment of Non-Infringement of the '211 Patent**

11   **114.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

12   in paragraphs 94-113 above.

13   **115.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

14   have infringed or are infringing the '211 Patent.

15   **116.**   MEC, HRTV, and XpressBet have not, and are not infringing the '211

16   Patent.

17   **117.**   Accordingly, there is an actual case or controversy over Defendants'

18   non-infringement, and MEC, HRTV, and XpressBet seek a judgment holding that

19   they do not infringe and have not infringed, directly or indirectly, contributorily or

20   by inducement, any claim of the '211 Patent.

21                                    **Fifth Counterclaim:**

22   **Declaratory Judgment of Non-Infringement of the '354 Patent**

23   **118.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

24   in paragraphs 94-117 above.

25   **119.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

26   have infringed or are infringing the '354 Patent.

27   **120.**   MEC, HRTV, and XpressBet have not, and are not infringing the '354

28   Patent.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

121.   Accordingly, there is an actual case or controversy over Defendants' non-infringement, and MEC, HRTV, and XpressBet seek a judgment holding that they do not infringe and have not infringed, directly or indirectly, contributorily or by inducement, any claim of the '354 Patent.

<div align="center">

**Sixth Counterclaim:**

**Declaratory Judgment of Invalidity of the '981 Patent**

</div>

122.   MEC, HRTV, and XpressBet incorporate by reference their allegations in paragraphs 94-121 above.

123.   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet have infringed or are infringing the '981 Patent, and that the patent is valid, which allegations Defendants deny.

124.   The '981 Patent is invalid for failure to meet the Conditions for Patentability specified in 35 U.S.C. §§ 102, 103 and 112 because the alleged invention thereof was used or known by others in this country or was patented or described by a publication before its invention; or was patented or described in a publication or was in public use or for sale more than one year before the date of the patent application; or was not invented by the named inventors; or was invented by another prior to the alleged invention; or was taught by, suggested by, and/or obvious in view of, the prior art; or is indefinite; or does not contain a proper written description; or does not disclose the best mode of the invention.

125.   Accordingly, MEC, HRTV, and XpressBet seek a judgment declaring that the '981 Patent is invalid.

<div align="center">

**Seventh Counterclaim:**

**Declaratory Judgment of Invalidity of the '709 Patent**

</div>

126.   MEC, HRTV, and XpressBet incorporate by reference their allegations in paragraphs 94-125 above.

127.   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet have infringed or are infringing the '709 Patent, and that the patent is valid, which

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   allegations Defendants deny.

2       **128.**  The '709 Patent is invalid for failure to meet the Conditions for

3   Patentability specified in 35 U.S.C. §§ 102, 103 and 112 because the alleged

4   invention thereof was used or known by others in this country or was patented or

5   described by a publication before its invention; or was patented or described in a

6   publication or was in public use or for sale more than one year before the date of

7   the patent application; or was not invented by the named inventors; or was invented

8   by another prior to the alleged invention; or was taught by, suggested by, and/or

9   obvious in view of, the prior art; or is indefinite; or does not contain a proper

10  written description; or does not disclose the best mode of the invention.

11      **129.**  Accordingly, MEC, HRTV, and XpressBet seek a judgment declaring

12  that the '709 Patent is invalid.

### Eighth Counterclaim:

### Declaratory Judgment of Invalidity of the '068 Patent

15      **130.**  MEC, HRTV, and XpressBet incorporate by reference their allegations

16  in paragraphs 94-129 above.

17      **131.**  ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

18  have infringed or are infringing the '068 Patent, and that the patent is valid, which

19  allegations Defendants deny.

20      **132.**  The '068 Patent is invalid for failure to meet the Conditions for

21  Patentability specified in 35 U.S.C. §§ 102, 103 and 112 because the alleged

22  invention thereof was used or known by others in this country or was patented or

23  described by a publication before its invention; or was patented or described in a

24  publication or was in public use or for sale more than one year before the date of

25  the patent application; or was not invented by the named inventors; or was invented

26  by another prior to the alleged invention; or was taught by, suggested by, and/or

27  obvious in view of, the prior art; or is indefinite; or does not contain a proper

28  written description; or does not disclose the best mode of the invention.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FIRST        23        CASE NO. CV 07-03265 DDP (RCX)
AMENDED COMPLAINT

1    **133.**   Accordingly, MEC, HRTV, and XpressBet seek a judgment declaring

2    that the '068 Patent is invalid.

3    ### Ninth Counterclaim:

4    ### Declaratory Judgment of Invalidity of the '211 Patent

5    **134.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

6    in paragraphs 96-133 above.

7    **135.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

8    have infringed or are infringing the '211 Patent, and that the patent is valid, which

9    allegations Defendants deny.

10   **136.**   The '211 Patent is invalid for failure to meet the Conditions for

11   Patentability specified in 35 U.S.C. §§ 102, 103 and 112 because the alleged

12   invention thereof was used or known by others in this country or was patented or

13   described by a publication before its invention; or was patented or described in a

14   publication or was in public use or for sale more than one year before the date of

15   the patent application; or was not invented by the named inventors; or was invented

16   by another prior to the alleged invention; or was taught by, suggested by, and/or

17   obvious in view of, the prior art; or is indefinite; or does not contain a proper

18   written description; or does not disclose the best mode of the invention.

19   **137.**   Accordingly, MEC, HRTV, and XpressBet seek a judgment declaring

20   that the '211 Patent is invalid.

21   ### Tenth Counterclaim:

22   ### Declaratory Judgment of Invalidity of the '354 Patent

23   **138.**   MEC, HRTV, and XpressBet incorporate by reference their allegations

24   in paragraphs 94-137 above.

25   **139.**   ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

26   have infringed or are infringing the '354 Patent, and that the patent is valid, which

27   allegations Defendants deny.

28   **140.**   The '354 Patent is invalid for failure to meet the Conditions for

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Patentability specified in 35 U.S.C. §§ 102, 103 and 112 because the alleged

2    invention thereof was used or known by others in this country or was patented or

3    described by a publication before its invention; or was patented or described in a

4    publication or was in public use or for sale more than one year before the date of

5    the patent application; or was not invented by the named inventors; or was invented

6    by another prior to the alleged invention; or was taught by, suggested by, and/or

7    obvious in view of, the prior art; or is indefinite; or does not contain a proper

8    written description; or does not disclose the best mode of the invention.

9        **141.**  Accordingly, MEC, HRTV, and XpressBet seek a judgment declaring

10   that the '354 Patent is invalid.

## Eleventh Counterclaim:

## Declaratory Judgment of Unenforceability of the '981 and '709 Patents

13       **142.**  MEC, HRTV, and XpressBet incorporate by reference their allegations

14   in paragraphs 67-81, 82-93 and 94-141 above.

15       **143.**  ODS/TVG asserts in this action that MEC, HRTV, and XpressBet

16   have infringed or are infringing the '981 and '709 patents, and that the patents are

17   valid and enforceable.

18       **144.**  The '981 and '709 patents are unenforceable because of the

19   inequitable conduct of ODS/TVG, the inventors of the '981 and '709 patents,

20   and/or others substantially involved in the prosecution of the applications resulting

21   in the '981 and '709 patents, as alleged above in paragraphs 67-93, which are

22   incorporated herein by reference.

23       **145.**  Accordingly, MEC, HRTV, and XpressBet seek a judgment declaring

24   that the '981 and '709 patents are unenforceable.

## PRAYER FOR RELIEF

26   WHEREFORE, Defendants pray for relief as follows:

27       **A.**     Dismissal with Prejudice of Plaintiff's claims for patent infringement.

28   ///

DEFENDANTS' ANSWER TO FIRST          25          CASE NO. CV 07-03265 DDP (RCX)
AMENDED COMPLAINT

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  **B.**  Judgment against the Plaintiff declaring the '981 Patent not infringed

2 by Defendants;

3  **C.**  Judgment against the Plaintiff declaring the '709 Patent not infringed

4 by Defendants;

5  **D.**  Judgment against the Plaintiff declaring the '068 Patent not infringed

6 by Defendants;

7  **E.**  Judgment against the Plaintiff declaring the '211 Patent not infringed

8 by Defendants;

9  **F.**  Judgment against the Plaintiff declaring the '354 Patent not infringed

10 by Defendants;

11  **G.**  Judgment against the Plaintiff declaring the '981 Patent is invalid;

12  **H.**  Judgment against the Plaintiff declaring the '709 Patent is invalid;

13  **I.**  Judgment against the Plaintiff declaring the '068 Patent is invalid;

14  **J.**  Judgment against the Plaintiff declaring the '211 Patent is invalid;

15  **K.**  Judgment against the Plaintiff declaring the '354 Patent is invalid;

16  **L.**  Judgment against the Plaintiff declaring the '981 and '709 patents

17 unenforceable;

18  **M.**  A declaration that MEC, HRTV, and XpressBet's defenses and

19 counterclaims present an exceptional case entitling them to, and therefore awarding

20 them, their reasonable attorneys' fees under 35 U.S.C. § 285;

21  **N.**  Award of costs to Defendants;

22  **O.**  Award to Defendants such other relief as the Court deems just and

23 reasonable.

24 ///

25 ///

26 ///

27 ///

28 ///

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants respectfully request a jury trial on all issues so triable, including without limitation, Plaintiff's claims and Defendants' affirmative defenses and counterclaims.

Dated:  February 26, 2008                         FENWICK & WEST LLP

By:
Darryl M. Woo
(CSB No. 100513)
555 California Street
San Francisco, CA  94104
Telephone:  (415) 875-2300
Facsimile:   (415) 281-1350

Attorneys for Defendants
MAGNA ENTERTAINMENT CORP.,
HRTV LLC, and XPRESSBET, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FIRST
AMENDED COMPLAINT

27

CASE NO. CV 07-03265 DDP (RCX)

## PROOF OF SERVICE

The undersigned declares as follows:

I am a citizen of the United States and employed in Santa Clara County, State of California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is Fenwick & West LLP, 801 California Street, Mountain View, California  94041.  On the date set forth below, I served a copy of the following document(s):

### ANSWER TO FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS (JURY TRIAL DEMANDED)

on the interested parties in the subject action by placing a true copy thereof as indicated below, addressed as follows:

Richard L. Stone
Jordan Kushner
David Ben-Meir
Hogan & Hartson LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone:  310-785-4600
Fax:  310-785-4601
rlstone@hhlaw.com
jbkushner@hhlaw.com
dhben-meir@hhlaw.com

☒ **BY E-MAIL:** by causing to be transmitted via e-mail the document(s) listed above to e-mail address(es) set forth above.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.

Date:  February 27, 2008

Mashhood Rassam

1278980.2

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Exhibit A

Copyright 1993 Business Wire, Inc.
Business Wire

December 7, 1993, Tuesday

DISTRIBUTION: Business Editors

LENGTH: 700 words

HEADLINE: AUTOTOTE INTRODUCES REVOLUTIONARY "PROBE XL" PARI-MUTUEL/VIDEO GAMING TERMINAL AND SOFTWARE - Technically Advanced Terminal Has Unequaled Capability In Pari-Mutuel Markets -

DATELINE: NEWARK, Del.

BODY:

AUTOTOTE CORPORATION (NASDAQ/NMS:TOTE) Tuesday unveiled the latest addition to its PROBE family of products - the interactive PROBE-XL multi-media terminal featuring AUTOTOTE'S new Screen Activated Machine ("SAM") software for both pari-mutuel and video gaming.

This multi-purpose SAM software runs without modification on AUTOTOTE's existing series of PROBE products. AUTOTOTE provides pari-mutuel wagering systems to approximately 70% of the North American pari-mutuel tracks.

The PROBE XL is a unique, technologically advanced, multi-functional video wagering terminal which enables customers to place their own pari-mutuel bets and play video wagering games. The innovative features of the PROBE XL offer players and the facility management more wagering options than any other product on the market.

Using the PROBE XL, customers touch the screen to select wagering options on a full card of live and/or remote races, or choose from a library of the most popular video wagering games including black jack, keno, line games and a variety of poker games. AUTOTOTE's PROBE XL is the only video gaming terminal to feature "Picture-in Picture" displays so customers can watch broadcasted races and other images from multiple channels while continuing to wager. In addition, the PROBE XL offers account betting (cashless), voucher and cash wagering.

The physical attributes of the PROBE XL include: a 19-inch high resolution, full color, video monitor with Touch Screen; Picture-in Picture displays; high-speed thermal or dual port impact printer; ATM-like magnetic card scanning and bill and coin acceptors; all encompassed in a ergonomically designed, user friendly terminal.

AUTOTOTE's new SAM software for video gaming and pari-mutuel wagering also runs on existing customer's PROBE terminals.

Many advantages are available for the first time with the PROBE XL including: providing additional wagering opportunities for customers between races; player tracking; cross market pari-mutuel wagering; tournament play; progressive jackpot capability with interactive customer communications and accounting; on-line/real-time communications; adaptable for future programming, customer recognition for special incentives, and multi-lingual text and voice instruction.

Commenting on the announcement, A. Lorne Weil, Chief Executive Officer of AUTOTOTE CORPORATION stated, "The PROBE XL is an entirely new class of product for the racing industry. Combined with SAM software, race tracks can offer popular video gaming to attract new customers to race tracks. We believe this will strengthen legislative

AUTOTOTE INTRODUCES REVOLUTIONARY "PROBE XL" PARI-MUTUEL/VIDEO GAMING TERMINAL
AND SOFTWARE - Technically Advanced Terminal Has Unequaled Capability In Pari-Mutuel Markets - Business
Wire De

efforts to introduce video wagering in States where it is now restrained. There are significant benefits to local communities in offering video gaming within controlled pari-mutuel facilities. Current AUTOTOTE race track customers can now easily add this capability to our existing family of PROBE products without having to modify their system hardware."

Weil further noted, "The PROBE XL and SAM software will accelerate the expansion of pari-mutuel wagering into new markets and customers."

AUTOTOTE CORPORATION designs and manufactures computerized wagering equipment and provides facilities management for use in the race track, off track wagering, lotteries and legalized sports betting facilities and jai alai frontons. The company's systems are in use in the United States, Canada, Mexico, South America, the Far East and Europe. -0-

This information contained herein was obtained from the Management of AUTOTOTE CORPORATION and other sources deemed to be reliable. This does not constitute the solicitation of the purchase or sale of securities. Lippert/Heilshorn & Associates, Inc. is employed by the Company as its investor relations firm and the firm or its officers may have a position in the securities of this client Company.

CONTACT: AUTOTOTE CORPORATION, Newark
David Pye, 302/737-4300
OR
Lippert/Heilshorn & Associates, New York
Jeffrey Volk, 212/838-3777, ext. 102 or
Lorin Cohen, 212/838-3777, ext. 123

**LOAD-DATE:** December 8, 1993

Exhibit B

Copyright 1993 Business Wire, Inc.
Business Wire

December 9, 1993, Thursday

**DISTRIBUTION:** Business Editors

**LENGTH:** 537 words

**HEADLINE:** AUTOTOTE INTRODUCES REVOLUTIONARY "PROBE XL" PARI-MUTUEL/VIDEO GAMING
TERMINAL AND SOFTWARE; Company Receives Letter Of Intent From Manitoba Lotteries Corporation For
PROBE XL

**DATELINE:** NEWARK, Del.

**BODY:**

AUTOTOTE CORPORATION (NASDAQ/NMS Symbol: TOTE) today announced that it introduced at the
University of Arizona Symposium on Racing its new PROBE XL terminal. The PROBE XL is an interactive
multi-media terminal featuring AUTOTOTE's new Screen Activated Machine ("SAM") software for both pari-mutuel
and video gaming.  The PROBE XL is a unique, technologically advanced, multi- functional video wagering terminal
which enables customers to place their own pari-mutuel bets and play video wagering games. The innovative features of
the PROBE XL offer players and the facility management more wagering options than any other product on the market.
AUTOTOTE expects to install the PROBE XL at pari-mutuel facilities, Casinos, Riverboats and Native American
Casinos. Using the PROBE XL, customers touch the screen to select wagering options on a full card of live and/or
remote races, or choose from a library of the most popular video wagering games including black jack, keno, line games
and a variety of poker games. AUTOTOTE's PROBE XL is the only video gaming terminal to feature
"Picture-in-Picture" displays so customers can watch broadcasted races and other images from multiple channels while
continuing to wager. In addition, the PROBE XL offers account betting (cashless), voucher and cash wagering. At the
trade industry press conference, the Company also announced it has received a letter of intent from the Manitoba
Lotteries Corporation to install the PROBE XL system at Manitoba pari-mutuel sites by April, 1994.  A. Lorne Weil,
Chief Executive Officer of the Company, in his demonstration to the press commented, "The Manitoba opportunity
demonstrates the synergies made possible by this technology. The PROBE XL is a resource that will be shared by the
Manitoba lottery for video gaming and the racetracks for self-service pari-mutuel wagering. Based on the response we
have received so far, we are encouraged about similar synergies at Casinos, Riverboats and Native American Casinos."
Mr. Weil further noted, "We believe the PROBE XL and SAM software will accelerate the expansion of pari-mutuel
wagering to new markets and customers." AUTOTOTE CORPORATION designs and manufactures computerized
wagering equipment and provides facilities management for use in the race track, off-track wagering, lotteries and
legalized sports betting facilities and jai alai frontons. The Company's systems are in use in the United States, Canada,
Mexico, South America, the Far East and Europe. -0-

This information contained herein was obtained from the Management of AUTOTOTE CORPORATION and other
sources deemed to be reliable.  This does not constitute the solicitation of the purchase or sale of securities.
Lippert/Heilshorn & Associates, Inc. is employed by the Company as its investor relations firm and the firm or its
officers may have a position in the securities of this client Company.

CONTACT: Lippert/Heilshorn & Associates, New York

Page 2

AUTOTOTE INTRODUCES REVOLUTIONARY "PROBE XL" PARI-MUTUEL/VIDEO GAMING TERMINAL
AND SOFTWARE; Company Receives Letter Of Intent From Manitoba Lotteries Corporation For PROBE XL
Business Wire

Jeffrey Volk, 212/838-3777 Ext. 102
Lorin Cohen -- Ext. 123
or
Autotote Corp., Newark
David Pye, 302/737-4300

**LOAD-DATE:** December 10, 1993

Exhibit C

Copyright 1992 Business Wire, Inc.
Business Wire

August 27, 1992, Thursday

DISTRIBUTION: Business Editors & Cable Television/Technology Writers

LENGTH: 665 words

HEADLINE: Interactive cable service to provide off-track wagering in homes across the country

DATELINE: CHICAGO

BODY:

Interactive television leader NTN Communications Inc. as part of its proposed Cable Wagering Service, will soon be providing the opportunity for account and impulse wagering in the home, it was announced Wednesday by Dan Downs, NTN's vice president and chief operating officer, to the marketing executives of the Thoroughbred Racing Associations, The Harness Tracks of America and the American Quarter Horse Racing Associations.

Following a successful test run of NTN'S "Triples," an interactive horse racing game on the GTE Mainstreet Service (a subscriber-based cable channel that offers convenience services such as banking, library references, shopping, etc. reachable via the TV remote control), the California Federation of Racing Associations Inc. has introduced legislation that would permit interactive television wagering.

"Based on the overwhelmingly positive response to 'Triples,' we are now convinced there is a tremendous demand for a cable wagering service in the home. Working side by side with the racing industry, we plan to provide an expanded test in those states where it is legal some time in late 1993," said Downs.

Jim Smith, president of the California Federation of Racing Associations, said, "NTN has been the pioneer in developing what we consider to be the state of the art option as far as the future of home wagering across the country." He added, "Home wagering is the single most important means of enhancing the racing industry. With the introduction of home wagering, the industry, and the state of California specifically, will generate new racing patrons, as well as satisfy existing fans of the sport."

"Triples" has been running on Mainstreet since May, one evening a week, on Apollo Cable in Cerritos, Calif. Users play with and for points, rather than dollars.

As proposed, NTN's Cable Wagering Service will allow consumers to open an account with a race track. By using the television remote control, a consumer will select the race, horse, and wager on the interactive menu. Temporary accounts will also be an option of NTN's interactive service.

NTN, based in Carlsbad, Calif., established in 1983, was the first company to develop an interactive television game and commercially take it to the home market. Today NTN is the only interactive television network that offers its programming throughout North America, seven days a week, 24 hours a day, with a digital signal that reaches all of North America.

Its programming line-up includes 13 interactive games and programs, as well as daily national and world news of entertainment, sports, financial reports, up-to-the-minute sports scores and weather. It is utilized in hospitality business

Interactive cable service to provide off-track wagering in homes across the country Business Wire August 27, 1992, Thursday

outlets, the home on GTE Mainstreet and General Electric's "GEnie" on-line service, and educational systems. Today the NTN Entertainment Network is available in more than 600 hospitality outlets (pubs, restaurants and hotels).

The "Triples" game is currently played on NTN's Canadian hospitality network in conjunction with Canada's Sire Stakes. NTN plans to offer this game in U.S. hospitality outlets for the Breeder's Cup later this year.

"The 'Triples' game and wagering service are nice complements to our lineup of interactive programs and services," says Downs. "The game provides purer entertainment, while the real-time wagering offers an important service."

The NTN Network and its programming currently reaches over 1.5 million participants a month, and to date, has been played by more than 56 million participants. Internationally, NTN's interactive programming is available in the United States, Canada, the United Kingdom, and by the end of 1992, in Mexico and Australia.

CONTACT: NTN Communications Inc., Carlsbad, Calif.
Dan Downs, 619/438-7400
or
H.L. Lanzet Inc., New York
Herb Lanzet, 212/230-2520

Copyright 1992 Associated Press
All Rights Reserved

The Associated Press

October 18, 1992, Sunday, AM cycle

**SECTION:** Business News

**LENGTH:** 811 words

**HEADLINE:** System Would Allow Bettors to Place Wagers Via TV

**BYLINE:** By MICHAEL WHITE, AP Business Writer

**DATELINE:** LOS ANGELES

**BODY:**

Racing fans could bet on their favorite horses through their television sets if the state approves a new technology being tested by a company that pioneered interactive TV.

NTN Communications Inc. of Carlsbad, Calif., is betting the cash-strapped California Legislature will approve a bill making the state the first to institute its proposed Cable Wagering Service.

But racing industry officials are divided over whether the high-tech betting will hurt them by discouraging people from attending races.

And, the legislation is likely to attract the ire of religious groups that have battled other expansions of gambling in California. One Christian lobby group is already planning to oppose the measure.

In 1991, Californians bet $ 2.9 billion on horse races, producing $ 138.7 million in tax revenue. NTN believes in-home wagering would increase receipts 15 percent to 20 percent within a few years, said Dan Downs, the company's executive vice president.

"It gives the industry not only an opportunity to pick up new players, but recapture old players," said Downs, a former general manager of the Hollywood Park and Los Alamitos race tracks.

Cable Wagering is one of a number of interactive or two-way television technologies now being explored by high-tech companies. Some of the others would allow viewers to order their favorite movies piped into their homes or give them long distance access to computerized libraries.

NTN currently is testing the cable-wagering game, called Triples, in about 250 households in Cerritos, 15 miles southeast of downtown Los Angeles.

Viewers see each horse during a pre-race program. Then they key in numbers on a remote-control device to choose their horse and the amount of the bet. Because cable wagering is not yet legal, customers bet points instead of dollars.

Should cable betting become legal, bets would be covered by money the customer deposited ahead of time into an

System Would Allow Bettors to Place Wagers Via TV The Associated Press October 18, 1992, Sunday, AM cycle

account, Downs said.

Cable wagering is the latest of NTN's interactive ventures. The company beams interactive game shows and other programs by satellite to some 600 bars and lounges across the nation and in Great Britain, said Downs.

Among its offerings is the popular QB1 game, which allows viewers watching live NFL games to predict which plays the quarterback will call.

Cable Wagering Service should be ready for marketing by late 1993, he said.

But Matt Wess, general manager of the California Thoroughbred Breeders Association, says he is worried that interactive betting will erode attendance at the tracks.

"The scenario you hear about is there would be one race track somewhere and everyone would be betting on the same races. Obviously, they wouldn't need many horses, or as many horses," Wess said. That means less work for trainers, grooms and anyone else associated with the industry.

California introduced off-track betting parlors statewide in 1987, and since then revenues from on-track wagers has dropped.

In 1988, fans attending races at the state's six tracks and 10 fairs wagered $ 1.87 billion, compared to a total wagered of $ 2.6 billion including off-track wagering.

By 1991, the total amount wagered went up to $ 2.9 billion, but on-track betting declined to $ 1.6 billion, says the state's horse racing board.

However, because the tracks get a percentage of wagers placed in off-track parlors, some tracks, such as Del Mar north of San Diego, have become more profitable, said Craig Fravel, assistant general manager.

That has made Fravel a cautious booster of in-home wagering.

"The ramifications of it are pretty dramatic, just in terms of expansion of the market area and your ability to send your product to more people," he said.

Downs said concerns about track attendance could be addressed by allowing tracks to black out cable telecasts of races within 30 or 40 miles of the track just as other sporting events are blacked out for local TV audiences.

Pennsylvania and Kentucky allow a form of in-home wagering with TV viewers placing bets over the phone, but such bets account for a small fraction of the total and there are no plans to switch to the interactive TV system, officials say.

Art Croney, a lobbyist for the Sacramento-based Committee on Moral Concerns, said his group is certain to mount a campaign against California's home wagering bill.

"For every compulsive gambler, there is a devastated life and a devastated family. The last thing we need to do in California is put a greater burden on the family structure," he said.

Another potential pitfall is how to regulate in-home betting, said Sue Ross, a legislative analyst for the state Horse Racing Board.

For instance, it might prove difficult to determine whether customers were setting up illegal betting salons in their homes, Ms. Ross said.

System Would Allow Bettors to Place Wagers Via TV The Associated Press October 18, 1992, Sunday, AM cycle

The legislature is to consider the in-home racing bill next year.

Copyright 1993 The Chronicle Publishing Co.
The San Francisco Chronicle

DECEMBER 2, 1993, THURSDAY, FINAL EDITION

SECTION: NEWS; Pg. A1

LENGTH: 1055 words

HEADLINE: THE POTENTIAL FOR AT-HOME GAMBLING
High Stakes in the Living Room

BYLINE: Benjamin Pimentel, Chronicle Staff Writer

BODY:

In the high-tech future of interactive television, gamblers could bet against the house in the privacy of their homes, couch potatoes could rake in the big bucks with the remote control and the living room could be transformed into a high-roller's paradise.

It is all part of telegambling, one of many potential products of the cable television boom. But unlike home shopping or home banking, the idea of expanding horse race betting and lotteries into private domains has some major handicaps, not the least of which are opponents who brand interactive TV wagering as nothing more than home-delivered corruption.

"You could gamble your house away sitting in your house," said Art Croney of the Committee on Moral Concerns, an anti-gambling group.

Nevertheless, proponents predict that within a few years, the multimillion-dollar enterprise will revolutionize the faltering gaming industry. High- tech companies such as NTN Communications and Videotron are working with gaming companies to develop telegambling technology.

So far, home telegambling has been tested only in Quebec and Southern California. But a variety of interactive TV wagering games -- such as QB1, in which participants guess the plays in a live National Football League game -- are already played in bars and restaurants across the country, and high-tech companies have begun to develop a number of in-home games.

In Southern California, Carlsbad-based NTN Communications, an international producer and broadcaster of interactive television games, has been testing a game called Triples, in which players try to predict the winners of live horse races.

The game -- currently being played by about 3,500 cable TV subscribers in Cerritos and Carlsbad -- uses a set of "smart" equipment, including a cable decoder box and a remote channel changer. Players use the remote to pick horses displayed on the screen and win points for correct predictions.

Next year, NTN plans to introduce a game with more betting options, said Patrick Downs, NTN's president and founder.

THE POTENTIAL FOR AT-HOME GAMBLING High Stakes in the Living Room The San Francisco Chronicle
DECEMBER 2, 1993, THURSDAY, FINAL EDITION

"It would seem more like being in the race track," he said.

In Canada, Videotron and Loto Quebec just completed a one-year trial in Quebec City and Montreal for "Dollars en Direct," the first interactive TV wagering game in North America.

To play the bingo-like game, a cable subscriber opens a lottery account. On the game show, which airs every Monday night, the player enters the numbers drawn by the TV emcees on a personal electronic card displayed on the screen.

A player pays $ 3 (Canadian) for each game and can win up to $ 25,000.

"It was a very good experience," said Jean Pierre Roy, spokesman for Loto Quebec. "We learned a lot of things in terms of management and computer technology."

Interactive television could make gambling more exciting and accessible to more people, proponents say. In California, NTN Vice President Dan Downs said, telegambling could boost revenues for the horse racing industry from 15 percent to 20 percent within a few years.

"It has a potential to be a very big business," said Gary Arlen, an interactive media specialist in Bethesda, Md. "The down side is it is socially undesirable. It's really a political hot potato."

Indeed, critics are alarmed that gambling could become a regular living room activity.

Last spring, Assemblyman Curtis Tucker, D-Inglewood, deleted the provision for interactive television wagering in a gambling reform bill after overwhelming opposition from anti-gambling groups.

NOT READY FOR IT

"Obviously, California is not ready for it," Tucker said.

Patricia Whitney-Wise of the California Council of Churches, which is part of the anti-telegambling campaign, denounced the influence that in-home wagering would have on children.

But Dan Downs said built-in safeguards would prevent just anybody, particularly children, from having access to the system. Players would use personal identification numbers and passwords, he said. They would need to establish betting accounts in advance, and there would be limits to the size of these accounts.

Harvey Chinn of the California Council on Alcohol Problems was unimpressed and suggested that children with high computer literacy would find ways of breaking into the system.

"The average kid knows more about electronics than the parents do," he said. "(Gambling) will be advertised and glamorized in the home."

Roy of Loto Quebec acknowledged these fears and said company officials hope to expand television gambling slowly to avoid any backlash. Loto Quebec hopes to start a new television lottery game next year.

"We are making sure that we are launching a product that can be controlled," he said. "There are risks when you come up with new technology too fast and too quickly."

UNWELCOME TECHNOLOGY

In fact, not all gaming institutions in California welcome the new technology.

Debbie Schauf, general manager of the Pacific Coast Quarter Horse Racing Association in Los Alamitos, said

THE POTENTIAL FOR AT-HOME GAMBLING High Stakes in the Living Room The San Francisco Chronicle
DECEMBER 2, 1993, THURSDAY, FINAL EDITION

telegambling could lead to fewer people attending horse races and to lower profits for horse owners, breeders, trainers and jockeys.

Furthermore, she said, there is no guarantee of a dramatic increase in wagering, because telegambling would have to compete with other attractions on cable television.

California Lottery spokeswoman Joanne McNabb said lottery officials do not see any need to use interactive television as a way to make the California Lottery more exciting or convenient.

"The odds of Californians playing the lottery over the television are much longer, or worse, than the odds of winning the Superlotto jackpot," she said. "It's just not in the plans. . . . It's not an idea that we're taking seriously."

But efforts to legalize telegambling in California and elsewhere are expected to continue next year.

Cliff Goodrich, president of the Los Angeles Turf Club and a supporter of telegambling, suggested that opposition to in-home wagering may decrease after other industries join the interactive television network and telegambling becomes just one of hundreds of choices on cable TV.

But telegambling opponents say this will never happen and promised to keep shut the doors of private homes to any form of gambling on television.

"As long as they propose it, we will oppose it," Croney said.


LOAD-DATE: December 2, 1993

EXhibit D

# TABLE OF CONTENTS

**TUESDAY, DECEMBER 8, 1992**

**Morning Session:**
**Welcome and Introduction**
David E. Hooper, Coordinator, RTI Program ................................................................... 25
**"Capitalizing on Quality Service at the Track"**
    Moderator:  Tom Hinton, Author and Industry Consultant ...................................... 26

**Afternoon Session:**
**"The Program Revolution"**
    Introduction and moderated discussion ...................................................................... 45
    Moderator:  Dave Johnson, Television Personality and Track Announcer
    Rick Baedeker, Vice President for Marketing, Hollywood Park
    Phil Birsh, Publisher, *Post Parade*
    Bill Collopy, Marketing Manager, Equibase
    Steve Crist, former Editor-in-Chief, *The Racing Times*
    Jack Farnsworth, Publisher, *Daily Racing Form*
    Jane Goldstein, Director of Communications, Santa Anita
    Jerry Lawrence, Executive Vice President, New York Racing Association
    Dick Wilson, General Manager, Beulah Park


**WEDNESDAY, DECEMBER 9, 1992**

**Consecutive Morning Sessions:**
**Welcome and Introduction**
David E. Hooper, Coordinator, Race Track Industry Program ...................................... 65
Dr. Eugene G. Sander, Vice Provost and Dean,
The University of Arizona College of Agriculture ........................................................ 66

**Morning Session 1:**
**"If We Don't Hang Together, We'll All Hang Separately"**
    Moderator:  Joe Joyce, President, Wyoming Horse Racing, Inc. ............................. 68
    Nick Nicholson, Director, The Jockey Club ............................................................... 68
    Stan Bergstein, Executive Vice President, Harness Tracks of America .................. 71
    Fred Havenick, Director, Flagler Greyhound Track ................................................... 74
    Dan Fick, Senior Director of Racing, American Quarter Horse Association ............ 75
    Eugene M. Christiansen, President, Christiansen/Cummings Associates Inc. ......... 78

*i*

Morning Session 2:

## "Casino Gaming:  The Chips Are Down"

Introduction and moderated discussion ........................................................... 84
Moderator:  David Vance, Vice President, Edward J. DeBartolo Corp.
Blake Cumbers, Marketing Director, IGT
Hal Handel, Executive VP & GM, New Jersey Sports and Exposition Authority
Thomas H. Meeker, President, Churchill Downs

Afternoon Session 1:

## "Genuine Risks:  Safety and Health Issues"

Moderator:  George Bernet, Executive Editor, *Daily Racing Form* .................... 93
John Campbell, All-Time Leading Harness Driver ............................................ 94
Dr. Curtis L. Barrett, Professor, The University of Louisville ............................ 96
Dr. Ed Ford, Executive Director, The Grayson-Jockey Club Foundation .......... 98
Leonard Lavin, Chairman of the Board, Alberto Culver, Ltd. ...................... 100
Dr. Robert Addison, Primary Investigator, Rehabilitation Institute of Chicago ........... 101
John Giovanni, National Managing Director, The  Jockeys' Guild .................. 101
Dr. Joel Press,  Rehabilitation Institute of Chicago ...................................... 103

Afternoon Session 2:

## "New Technologies:  The Information Age"

Moderator: Mark Kaufman, Sales Consultant, IDB Communications Group .......... 108
Dr. Barry Stapley, Strategic Development Director, Satellite Information Services .... 110
Raymond Findley Jr., President &  C.E.O., Phoenix Datacrypt Systems .................... 112
Jim Smith, President, HQHRA at Los Alamitos/California
Federation of Race Tracks ........................................................................ 115
Eric Spector, Executive Vice President, Spector Entertainment ........................ 117
Dr. Lawrence Mann, Professor of Planning/Development,
The University of Arizona ......................................................................... 119


THURSDAY, DECEMBER 10, 1992

Consecutive Morning Sessions
Morning Session 1:

## "Indian Gaming:  We Have Our Reservations"

Moderator:  Dominic Frinzi, President, Harness Horsemen International .................. 126
William P. Gresser Sr., Vice President, Yuma Greyhound Park, Inc. ........................ 127
Dr. Roland Santoni, Professor of Law, Creighton University ........................ 130
Glenn Feldman, Attorney, O'Connor, Cavanagh, et al. .............................. 133
Thomas F. Metzen, Chairman, RCI Indian Gaming Committee .................. 136
Frank Miller, Director, Washington Gaming Commission ............................ 138

Table of Contents Continued

**Morning Session 2:**
## "Money Games:  Proper Pricing in the Marketplace"
Moderator:  Lester H. McKeever, President, Harness Tracks of America. .............. 144
Michael "Roxy" Roxborough, President, Las Vegas Sports Consultants .................,,, 144
Bruce Rimbo, President, Hubbard Enterprises ............................................................. 145
David Rovine, Director of Marketing, Rosecroft Raceway .................................... 149
Jack Lenavitt, Executive Vice President, Trinity Meadows/Raceway Park ............... 153

**Concurrent Afternoon Sessions**
**Morning Session A:**
## "Unity Through Uniformity"
Moderator:  John Hamilton, Executive Director, Thoroughbred
Owners and Breeders Association ...................................................................... 157
Norm Barron, Chairman-Elect, RCI............................................................................ 159
Gordon Hare, Executive Director, Oklahoma Horse Racing Commission .............. 162
Hugh Fitzsimons, Texas Racing Commission ...................................................... 164
Bruce Matthias, Simulcast Director, Los Angeles Turf Club .............................. 165
Doug Haecke, Systems Analyst/Programmer, IMS Racing ................................ 166
Bruce Garland, General Manager, The Meadowlands............................................ 168
Steve Wood, Track Superintendent, Santa Anita Park ..................................... 169

**Morning Session B:**
## "Owners:  Renewable Resource or Endangered Species?"
Introduction and moderated discussion ................................................................. 173
Moderator:  Burt Kinerk, Attorney, Haralson, Kinerk & Morey
W. Cothran Campbell, President, Dogwood Stable, Inc.
Tom Dorsey, Executive Director, United Thoroughbred Trainers of America, Inc.
Amy Owens, Racing Marketing Coordinator, American Quarter Horse Association
Ron Kirk, Chairman, TOBA Owners' Committee
Jim Johnson, Director of Operations, Keeneland Association
Stephen Robins, President, World Harness Owners Association

**Morning Session C:**
## "From the Base Up"
Moderator: Edward T. Ryan, VP & GM, Freehold Racing Association .................... 197
Jon Hubbs, President, Stabilizer, Inc. ................................................................... 197
Dr. Rob Gillette, D.VM., The University of Kansas .......................................... 199
Atsushi Miyairi, Asst. Mgr., Track Engineering Section Japan Racing Association .... 202
Charles E. Coon, President, Coon & Sons, Inc............................................................ 202
Dr. Dennis Meagher, Professor, University of California at Davis ....................... 204

Table of Contents Continued

FRIDAY, DECEMBER 10, 1992

**Consecutive Morning Sessions**
**Welcome and Introduction**
David E. Hooper, Coordinator, Race Track Industry Program ...................................... 215
Dr. Roy Ax, Head, Department of Animal Sciences,
The University of Arizona College of Agriculture .............................................................. 215

Morning Session 1:
## "Targeting On-Track Customers"
Moderator:  Dennis Dowd, President, Freehold Raceway .................................... 217
Lonny Powell, President, Multnomah Kennel Club ........................................... 218
Roy Berger, Executive Vice President, Wichita Greyhound Park ...................... 222
Allen Gutterman, Vice President of Marketing, NYRA .................................... 226
A.N. Nardone Jr., President, J.K. Carlton, Inc. ................................................ 228
Karl Garson, Turf writer, *Daily Racing Form* ................................................ 230
Bob Goldberg, Guest Columnist, *Daily Racing Form* .................................... 232

Morning Session 2:
## "Reaching the Customer Off Track"
Introduction and moderated discussion ............................................................. 239
Moderator:  Andy Beyer, Racing Editor, *The Washington Post*
A.N. Nardone Jr., President, J.K. Carlton, Inc.
Paul (Biff) Lowry, Southern Regional Manager, California Authority of Racing Fairs
John Imbriale, New York Racing Association
Katharine Maniz, Race Book Manager, Binion's Horseshoe Casino
Davis Etkin, President, Capitol District OTB
Steve Nagler, Producer, ABC National Racing Telecasts
John Long, President and COO, Ladbroke Racing Corporation

**Concurrent Afternoon Sessions**
Afternoon Session A:
## "Mixing and Matching:  Recipes for Success"
Moderator:  Michael Shagan, Consultant on Racing and Pari-Mutuel Wagering ........ 251
John Mooney, General Manager, Delaware Park ................................................. 252
Michael Mackey, Vice President, Thistledown ................................................. 254
Timothy M. Leuschner, Assistant to the President, Lincoln Greyhound Park ............ 256
Frank Petrosino, Pari-Mutuel Manager, The Meadowlands ................................. 258
Brad Higbee, Commissioner, Oregon Racing Commission ................................. 260
Robert Bork, Vice President, Arlington International Race Course ...................... 263

Afternoon Session B:

## "Safety as a Science"

Moderator: Steve Wood, Track Superintendent, Santa Anita,
Del Mar and Fairplex ............................................................... 271
Chuck Clanton, Associate Professor, Dept. of Agricultural Engineering,
The University of Minnesota ...................................................... 271
Marc H. Ratzlaff, D.V.M., Professor, College of Veterinary Medicine,
Washington State University ...................................................... 274
Dr. Yahiro Ueda, General Manager of Equine Research Institute,
Japan Racing Association ......................................................... 277
W. Theodore Hill, V.M.D, Chief Examining Veterinarian,
New York Racing Association ..................................................... 278

## 19th Annual Symposium on Racing Attendees ......................... 285

