O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ODS TECHNOLOGIES, L.P.,           )   Case No. CV 07-03265 DDP (RGx)
d/b/a TVG NETWORK, a              )
Delaware limited                  )   **Claim Construction Order**
partnership,                      )
                                  )   [Plaintiff's Opening Claim
              Plaintiff,          )   Construction Brief Filed on
                                  )   February 10, 2009, Markman
     v.                           )   hearing held on September 9,
                                  )   2009]
MAGNA ENTERTAINMENT               )
CORPORATION, a Delaware           )
corporation; ~~HRTV, INC., a~~    )
~~California corporation;~~        )
XPRESSBET, INC., a Delaware       )
corporation,                      )
                                  )
              Defendants.         )
                                  )
_____     )

     Plaintiff ODS Technologies, L.P. ("ODS") sued XpressBet, Inc.

("XpressBet") and Magna Entertainment Corp. ("Magna") for patent

infringement.[1]

     The patents at issue are U.S. Patent Office Nos. 5,830,068

("'068 Patent"); 6,004,211 ("'211 Patent"); 6,089,981 ("'981

_____

     [1]   On March 5, 2009, Magna filed a voluntary petition for
chapter 11 bankruptcy and ODS's claims against Magna were
automatically stayed pursuant to 11 U.S.C. § 362(a).  The Court
denied XpressBet's ex parte application for a stay pending the
resolution of the Magna bankruptcy proceedings on April 3, 2009.
(Dkt. No. 292.)

Patent"); 6,554,709 ("'709 patent"); and 7,229,354 ("'354 patent").
After reviewing the materials submitted by the parties and holding
a <u>Markman</u> hearing on September 9, 2009, the Court construes the
disputed claim terms in the manner set forth below.[2]

**I.   BACKGROUND AND PATENTS-IN-SUIT**

    **A.   Related Patents ('068, '211, '709, and '981 Patents)**

    Four of the five patents at issue share identical
specifications and relate to the same invention (following the
parties, the Court refers to these four patents as the "Related
Patents").  The first of the Related Patents – the '068 patent –
was filed in 1995.

    The underlying invention is an "interactive wagering system"
designed to facilitate "racetrack wagering."  '068 patent, 1:6-12.
According to the '068 application, the invention was designed to
facilitate wagering outside the confines of a racing facility,
thereby making race wagering accessible to a broader population,
and more convenient for those that regularly travel to racetracks
to place bets.

    The invention permits individual users to "receiv[e] racing
videos and racing information via a medium other than conventional
telephone lines and . . . display[] this information on a
television monitor."  <u>Id.</u>  The patent disclosures explain that the
live videos and racing data are transmitted over a "television

---

    [2]    XpressBet filed an ex parte application to strike an
expert declaration (the Lipoff Reply Declaration) and related
portions of ODS's Reply Claim Construction Brief, or in the
alternative, to file a Surreply Brief.  Because the Lipoff Reply
Declaration presets evidence not referenced in ODS's Opening Brief,
the Court treats the Surreply Brief that XpressBet filed with its
ex parte application as properly before the Court, and dismisses
the ex parte application as moot.

network – typically at a main distribution node for a cable

television network known as the 'headend.'"  '068 patent, 3:31-44.

The video and data are transmitted to "user terminals," where an

individual wagerer can access the information and place bets

accordingly.

The '211, '709, and '981 patents all rely on the original

disclosures in the '068 patent to maintain their claims to the 1995

priority date, and thus, the original disclosures govern the proper

scope and interpretation of all of the asserted claims.  See Alloc,

Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1372 (Fed. Cir. 2003).

**B.   '354 Patent**

The '354 patent was filed in 2001, and does not claim priority

to the original '068 patent.  It describes an interactive wagering

application that restricts user access on the basis of the

geographic location of the user's equipment, thereby ensuring that

bets cannot be received from jurisdictions where the law forbids

race wagering.  Specifically, the disclosures describe a mechanism

for distributing a "location verification token" to users in

geographic areas where wagering is permitted.  The parties agree

that the '354 patent relates to an Internet-based interactive race

wagering application.

**II.   THE CLAIM CONSTRUCTION PROCESS**

A patent infringement analysis involves two steps: (1)

determining the meaning and scope of the patent claims asserted to

be infringed; and (2) comparing the properly construed claims to

the accused device.  See generally Markman v. Westview Instruments,

Inc., 517 U.S. 370 (1996).  The first step in this sequence is

presently before the Court.

3

1    "It is a bedrock principle of patent law that the claims of a

2    patent define the invention to which the patentee is entitled the

3    right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312

4    (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  The

5    construction of a particular patent claim term presents a question

6    of law, to be decided by the Court.  Markman, 517 U.S. at 391.

7    The starting point for claim construction is a disputed term's

8    ordinary meaning.  Phillips, 415 F.3d at 1313.  Ordinary meaning,

9    in the patent claim construction context, is the meaning that a

10   person of ordinary skill in the art would attribute to a claim term

11   in the context of the entire patent at the time of the invention,

12   i.e., as of the effective filing date of the patent application.

13   ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed.

14   Cir. 2009).

15   The claims, of course, do not stand alone; a person of

16   ordinary skill in the art "is deemed to read [a] claim term not

17   only in the context of the particular claim in which the disputed

18   term appears, but in the context of the entire patent, including

19   the specification." Phillips, 415 F.3d at 1313-14 (emphasis

20   added).  Accordingly, the specification is "the primary basis for

21   construing the claims" in light of the "statutory requirement that

22   the specification describe the claimed invention in full, clear,

23   concise, and exact terms." Id. at 1315 (internal quotation marks

24   omitted) (emphasis added).

25   In determining the proper construction, the claim language,

26   specification, and prosecution history – together referred to as

27   the "intrinsic evidence" – are of paramount importance.  Id. at

28   1315 ("[T]he best source for understanding a technical term is the

4

specification from which it arose, informed, as needed, by the prosecution history." (emphasis added) (internal quotation marks omitted)).   Consistent with this principle, courts have recognized that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  _Id._ at 1316.   In such cases, the inventor's lexicography governs.  _Id._   In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  _Id._

While the Court interprets claim terms in light of the specification, it should generally not "import[] limitations from the specification into the claims absent a clear disclaimer of claim scope." _Andersen Corp. v. Fiber Composites, LLC_, 474 F.3d 1361, 1373 (Fed. Cir. 2007).  "[T]he distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." _Phillips_, 415 F.3d at 1323. In walking this "tightrope," _Andersen_, 474 F.3d at 1373, the Court hews to the question of "how a person of ordinary skill in the art would understand the claim terms." _Phillips_, 415 F.3d at 1323.

Consideration of intrinsic evidence will resolve any claim term ambiguity in most circumstances.  _See id._ at 1313-14.   Where it does not, however, the Court may consider certain "extrinsic evidence." _See id._ at 1317.  Expert testimony, for example, may provide helpful background on the technology at issue, explain how an invention works, or establish that a claim term has a particular meaning in the relevant field.  _See id._ at 1319.   Dictionaries and treatises may also be helpful in this regard.  _Id._ at 1318.

1   Precedent counsels against reliance on dictionary definitions at

2   the expense of the specification, however, because such reliance

3   "focuses the inquiry on the abstract meaning of words rather than

4   on the meaning of claim terms within the context of the patent."

5   Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145

6   (Fed. Cir. 2005).

7       The Court's ultimate goal is to construe the disputed terms in

8   a manner consistent with the way the inventor defined them and a

9   person of ordinary skill in the art would understand them.  "The

10  construction that stays true to the claim language and most

11  naturally aligns with the patent's description of the invention

12  will be, in the end, the correct construction."  Phillips, 415 F.3d

13  at 1316 (internal quotation marks ommitted).

14  **III. MEANS-PLUS-FUNCTION**

15      One of the claims before the Court is presented in a means-

16  plus-function format.  See 35 U.S.C. § 112(6) (permitting claims to

17  means performing a function).  The scope of such claims is limited

18  to the structures or acts described in the patent's specification

19  for performing those functions, and their equivalents.  E.g., J&M

20  Corp. v. Harley Davidson, Inc., 269 F.3d 1360, 1367 (Fed. Cir.

21  2001).

22      Interpreting means-plus-function claims requires the Court to

23  identify the claimed function, and then, to determine the

24  corresponding structures in the specification.  Omega Eng'g, Inc.

25  v. Raytek Corp., 334 F.3d 1314, 1321 (Fed. Cir. 2003).  For claim

26  construction purposes, courts should identify as corresponding

27  structures only the specific structures actually described in the

28  specification, as opposed to broader, but undisclosed categories of

6

such structures.  <u>Smiths Indus. Med. Sys. v. Vital Signs, Inc.</u>, 183 F.3d 1347, 1357 (Fed. Cir. 1999).  Where a means-plus-function claim fails to describe a clear corresponding structure, the patent claim must be deemed indefinite, and thus invalid.  <u>Med Instrumentation & Diagnostics Corp. v. Elekta AB</u>, 344 F.3d 1205, 1210 (Fed. Cir. 2003).

**IV.   PERSON OF ORDINARY SKILL IN THE ART**

The parties agree that a person of ordinary skill in the relevant art would not be an expert in any particular discipline, and that such a person would possess an undergraduate degree in computer or electrical engineering or the equivalent in work experience.  (<u>E.g.</u>  Lipoff Decl. ¶ 6; Shamos Opp'n Decl. ¶ 10.) They also agree that a person of ordinary skill in the art would have basic knowledge of the race wagering business.

**V.   CONSTRUCTION OF CLAIM TERMS**

**A.   Claim Terms for the Related Patents**

1.   <u>"User terminal"</u>

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| a personal device that enables a user to interact or communicate with other elements of a system or network | a device for receiving video signals and racing data and separating out the racing data from the video signals | a device that enables a user to display video signals and racing data transmitted over a system or network |

XpressBet seeks to narrow ODS's proposed construction of the claim term "user terminal," contending that term must be understood

7

1  as referencing a device for "separating out" racing data and video

2  signals from a single transmission.  ODS offers a much broader

3  construction, arguing that a user terminal performs no specific

4  function beyond enabling a user to "interact or communicate" with

5  some other element of a system or network.

6      The Court concludes that XpressBet's proposed construction is

7  unduly narrow.

8      XpressBet has not demonstrated that the patentees intended

9  video/data sorting functionality as a necessary element of the

10 disputed term.  The specification certainly suggests that a user

11 terminal <u>could</u> serve as a video feed and data sorter in some

12 applications, and several of the patentees' proposed embodiments

13 describe user terminals that perform some mode of video/data

14 sorting.  The Related Patents also describe an embodiment where

15 video and data "switching and splitting" would occur <u>before</u> the

16 transmission reaches an individual user terminal.  '981 patent,

17 22:43-44; (<u>see also</u> Lipoff Decl. ¶ 18 (describing preferred

18 embodiment in which video/data sorting occurs in this manner)).

19 Because it is generally error to adopt a claim construction that

20 would exclude one of the patentees' preferred embodiments, <u>MBO</u>

21 <u>Labs., Inc. v. Becton, Dickinson & Co.</u>, 474 F.3d 1323, 1333 (Fed.

22 Cir. 2007), the Court is reluctant to construe the term in the

23 manner XpressBet proposes.

24     Although XpressBet's proposed construction is too narrow,

25 ODS's proposed construction does too little to clarify the term's

26 meaning.  Moreover, ODS offers no intrinsic evidence in support of

27 its contention that a user terminal must be a "personal device."

28

1  A review of the Related Patents reveals that the patentees
2  viewed user terminals, in all reasonably conceivable embodiments,
3  as devices that would enable individual end-users to access both
4  live racing videos and related data.  Accordingly, the Court
5  construes the claim term "user terminal" as signifying "a device
6  that enables a user to receive and display video signals and racing
7  data transmitted over a system or network."

8       2.   "Video and data distribution system"

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| a system for distributing video and data | a satellite distribution, cable television distribution (cable headend) or television broadcasting system capable of delivering racing video signals and racing data from a wagering data management facility in real time to users | a satellite distribution, cable television distribution (cable headend) or television broadcasting system capable of delivering racing video signals and racing data from a wagering data management facility in real time to users |

26  The parties' conflicting interpretations of the claim term
27  "video and data distribution system" are the crux of the matter
28  before the Court.  ODS contends that the patentees envisioned a

1  system for delivering racing videos and data to individual users

2  that was unbound to any particular distribution technology.  Thus,

3  in ODS's view, the distribution system described in the Related

4  Patents could be a television signal (either through satellite,

5  cable, or a television broadcast medium) as set forth in the

6  preferred embodiments, or, it could be an Internet-based mode of

7  video and data delivery.

8      XpressBet, for its part, stresses that the patentees' use of

9  the term "video and data distribution system" in the patent

10  disclosures reveals that the term refers to a television

11  distribution medium of some kind.  Relying on the declaration of

12  one of their experts, Dr. Michael Ian Shamos, XpressBet contends

13  that the video and data distribution systems described in the

14  Related Patents are different in kind from Internet-based video and

15  data distribution systems, and as such, a person with ordinary

16  skill in the art would understand that the claims did not encompass

17  distribution over the Internet.  (Shamos Opp'n Decl. ¶ 22.)

18      According to Dr. Shamos, the television distribution mediums

19  discussed in the specifications all rely on a form of broadcast

20  technology, i.e., a one-to-many mode of transmission.  The

21  Internet, in contrast, operates on a one-to-one, unicast, mode of

22  transmission, with each data feed addressed from a server to an

23  individual computer (and vice versa).  He further opines that real

24  time video distribution over the Internet was not feasible in 1995,

25  and accordingly, it makes little sense to read the patentees' use

26  of the term "video and data distribution system" as implicitly

27  encompassing the Internet.  (Shamos Surreply Decl. ¶ 9.)

28

1    The Court agrees with XpressBet that ODS's proposed
2  construction sweeps too broadly.

3    Throughout the specifications and statements of preferred
4  embodiments, the Related Patents reference video and data delivery
5  through a medium analogous to methods that, in 1995, were commonly
6  used for the distribution of a television signal.  The patentees'
7  overarching description of the invention, for example, describes an
8  interactive wagering system that enables individual users to view
9  racing videos on a "television monitor."  See Honeywell Int'l, Inc.
10 v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006)
11 (explaining that where a patentee uses descriptive terms such as
12 "the invention" or "this invention," courts may treat the
13 corresponding description as limiting claim scope).  Elsewhere, the
14 patentees explain that video and data will be delivered over a
15 "television channel."  '981 patent 3:50.

16    The specifications identify cable, satellite, and traditional
17 television broadcast as the likely methods for video and data
18 distribution, and fails to describe – even in passing – any non-
19 television based mode of distribution.  The absence of any
20 reference to Internet-based video and data distribution is
21 particularly telling in light of the patentees' discussion of the
22 use of a "modem" in connection with other aspects of the invention.
23 One of the patent's preferred embodiments describes a scheme where
24 individual users would receive racing data and live video through
25 cable television transmission, but would relay specific bets
26 through the use of a modem, transmitting a signal over telephone
27 wires.  The disclosures do not, however, discuss the use of a
28 modem, or any Internet-based application, in connection with the

1  distribution of racing data and live racing video.

2      ODS's expert, Stuart Lipoff, in his Reply Declaration,

3  contends that video and data distribution delivery over the

4  Internet was commonplace in 1995, and as a result, a person with

5  ordinary skill in the art would recognize the patentees' use of the

6  term "video and data distribution system" as implicitly referencing

7  Internet-based delivery.  Lipoff provides no support for this

8  factual premise, and the Court is inclined to agree with

9  XpressBet's expert that it is implausible.  See On Demand Mach.

10 Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1340 (Fed. Cir. 2006)

11 (explaining that a patent claim "cannot be of broader scope than

12 the invention that is set forth in the specification").

13     The Court agrees with ODS that limitations contained within

14 preferred embodiments should, generally speaking, not be construed

15 as claim limitations absent a specific disclaimer.  See, e.g.,

16 Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir.

17 2004).  Nonetheless, the Court must construe disputed terms in a

18 manner that "naturally" flows from the language that the patentees

19 themselves used.  Phillips, 415 F.3d at 1316.  The consistency with

20 which the patentees described their invention as reliant on

21 existing television distribution systems, and the absence of any

22 reference to alternative distribution methods (i.e., methods that

23 rely on some medium other than cable, satellite, or broadcast

24 television), persuades the Court that the patentees intended the

25 disputed claim term to refer to a television distribution medium,

26 different in kind from Internet-based video and data distribution.

27     To be sure, many of the Related Patents' specific claims and

28 specifications are phrased broadly.  See, e.g., '211 patent, 17:34-

1   36 (claiming that video and data may be distributed through "any

2   suitable conventional technology").  Even so, adopting ODS's

3   proposed construction would require the Court to assume that the

4   patentees claimed to invent a novel mode of Internet-based

5   interactive wagering without referencing any Internet related

6   applications, and describing preferred embodiments that depend on

7   hardware driven technology that would be entirely out of place in

8   an Internet-based, software dependent, distribution system.

9   Because this construction does not "naturally align[] with the

10  patent's description of the invention," the Court rejects it, and

11  instead adopts XpressBet's proposed construction.[3]

13      3.   "Wagering data management facility"

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| a facility for managing wagering data | a totalisator (or stand-alone computer system capable of communicating with totalisators) that provides wagering data | a totalisator (or stand-alone computer system capable of communicating with totalisators) that provides wagering data |

_____

[3]      ODS argues that the Related Patents' prosecution history
supports its proposed construction, pointing to the patentees'
removal of the phrase "on at least one television channel" from the
claim that issued as the '068 patent.  This single item of
prosecution history, without any additional evidence of the
patentees' intent, is not conclusive enough to convince the Court
to adopt ODS's proposed construction.

1   The parties disagree about whether the claim term "wagering

2   data management facility" requires construction.  ODS contends that

3   the term speaks for itself, and proposes a superficial reordering

4   of the words in the phrase.  XpressBet, in response, argues that

5   the term carries a specific meaning within the context of the

6   Related Patents.

7   ODS has not established that the disputed term carries any

8   ascertainable "ordinary meaning."  Indeed, the Court is persuaded

9   that the term "wagering data management facility" is considerably

10  opaque.  Accordingly, the Court looks to the specifications for

11  guidance.

12  The specifications make clear that a wagering data management

13  facility is either: 1) a totalisator; or 2) a computer system

14  capable of communicating with totalisators.[4]  <u>E.g.</u>, '068 patent,

15  18:42-45.  Thus, XpressBet's proposed construction flows directly

16  from the patentees' description of their invention.  ODS contends

17  that XpressBet's construction is too narrow, but fails to identify

18  what exactly it leaves out.  Accordingly, the Court adopts

19  XpressBet's proposed construction.

20          4.   <u>"Racing data interface"</u>

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

21
22
23
24
25
26
27

_____

28      [4]    A "totalisator" is a an automated system for calculating
and displaying payoff odds.  '068 patent, 5:38-41.

| A system for communicating racing data | a device that processes racing data received from a wagering data management facility and provides the processed data to a video and data distribution system | a device that processes racing data and provides the processed data to a video and data distribution system |
|---|---|---|

The parties dispute the meaning of the claim term "racing data interface."

ODS's proposed construction of the term "interface" makes no effort to constrain the range of meanings the term evokes.  ODS's construction leaves unanswered, for example, the question of how an "interface" can function as a communication "system."  Further, if the claim term "racing data interface" refers to a "system for communicating racing data," as ODS contends, then the meaning of the term "video and data distribution system" becomes even murkier.

The Court concludes that XpressBet's proposed construction better captures the manner in which the disclosures use the disputed term.  The specifications teach that a "racing data interface" is a device that "processes racing data and provides the processed data to a video and data distribution system."  '068 patent, 4:1-6.  XpressBet thus derives its proposed construction directly from the patentees' claim specifications.

ODS, as it argues elsewhere, contends that XpressBet seeks to import limitations articulated in the specifications to narrow

claim scope in contravention of established patent law principles. The Court disagrees.   XpressBet's proposed construction adopts the language the patentees' themselves used to describe how a "racing data interface" would operate in the context of the larger invention.   If the patentees' own description of the term fails to capture the breadth of its meaning, than the onus is on ODS to explain what exactly the specification leaves out.   ODS offers no such explanation.

The Court is inclined to modify XpressBet's proposed construction in one respect.   The Related Patents use the term "racing data interface" to refer to a device that processes data from a totlisator (or a system connected with one) <u>and</u>, at least in some applications, racing data from other sources.   <u>See, e.g.</u>, '068 patent, 19:15-27.   Accordingly, the Court is inclined to construe the term as referencing "a device that processes racing data and provides the processed data to a video and data distribution system."

  5.   <u>"Wager" and "wagering"</u>

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| a sum of money risked on the outcome of an uncertain event | something risked or staked on the outcome of an uncertain event (risking something on the outcome of an uncertain event) | a sum of money risked on the outcome of an uncertain event |

1    The Court agrees with ODS that a person of ordinary skill in

2  the art would understand the terms "wager" and "wagering," in the

3  context of the claims at issue, as referring to money bets.  See,

4  e.g., '981 patent, 1:16-29; 5:63-6:1 (describing the invention's

5  overarching goal of replicating the form of race wagering common at

6  racetracks and off-track betting facilities, i.e., risking money on

7  the outcome of a given race).  As both parties acknowledge, the

8  patent claims must be read in the context of the horse race

9  wagering industry.  As such, the verb "to wager," in its ordinary

10 sense, connotes the placement of money bets based on the outcome of

11 a particular racing event.

12    The specifications align with this straightforward reading of

13 the term "to wager," and the preferred embodiments describe an

14 interactive wagering system pursuant to which an individual user

15 can transfer money from a given bank account directly to an entity

16 that takes bets.  XpressBet can point to no intrinsic evidence

17 indicating that the patentees used the verb "to wager" to refer to

18 any other, non-money based form of betting on the outcome of races,

19 and the Court is not persuaded by XpressBet's extrinsic evidence of

20 common non-money based forms of "wagering."

21    Accordingly, the Court adopts ODS's proposed construction.

22         6.   "Off-track" and "remote from any racetrack"

| Term | ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|---|
| | | | |
| | | | |

17

| off-track | away from any licensed betting establishment | at a place other than the racetrack where the racing event is taking place | at a place other than the racetrack where the racing event is taking place |
|---|---|---|---|
| remote from any racetrack | away from any licensed betting establishment | at a place other than the racetrack | at a place other than the racetrack |

XpressBet contends that the claim term "off-track" refers to race wagering that occurs anywhere other than the place where the race in question is taking place, and the term "remote from any racetrack" simply means "at a place other than the racetrack."  ODS disagrees, and contends that the intrinsic evidence proves that the patentees intended both terms to refer to wagering that occurs "away from any licensed establishment."

The Court agrees with XpressBet that the terms "off-track" and "remote from any racetrack" must be construed such that they carry distinct meanings.  See Merck & Co., Inc. v. Teva Pharm. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

ODS makes no attempt to distinguish the two terms.  Instead, it contends that the intrinsic evidence proves that the purpose of

1   the patentees' invention was to provide a means for engaging in

2   interactive wagering that did not require traveling to a race track

3   <u>or</u> a licensed off-track betting location.  As this was the

4   animating reason for the invention, they argue, the claims' use of

5   the terms "off-track" and "remote from the track" must be

6   understood as carrying a specific technical meaning.

7       ODS is correct that the Related Patents describe their core

8   innovation as an improvement on methods for engaging in off-track

9   betting that existed in 1995.  The patents do not, however,

10  disclaim the use of their invention in licensed betting

11  establishments.  Indeed, the Court finds no intrinsic evidence in

12  the claims or specifications suggesting that the invention would

13  <u>only</u> be of use in individual homes or business that are not

14  "licensed betting establishments."

15      In sum, the Court concludes that XpressBet's proposed

16  construction aligns with the most natural reading of the term "off-

17  track" – a commonly used term in the race wagering context[5] – and

18  its proposed construction of "remote from any racetrack" must

19  prevail because it imbues the two disputed claim terms with

20  independent definitions.

21          7.   <u>"Means for selecting a racing video simulcast</u>

22               <u>(corresponding to a given track)"</u>

23

24  _____

25      [5]   According to the undisputed testimony of one of
    XpressBet's  experts, Christopher Scherf, anyone reasonably
26  familiar with race wagering would understand the term "off-track"
    as encompassing "licensed off-track betting establishments."  (<u>See</u>
27  Scherf Opp'n Decl. ¶¶ 6-7.)  These establishments could be
    traditional off-track betting locations, but also "race tracks
28  which offer wagering on races being run at other race tracks, and
    private homes in states which permit wagering from home." (<u>Id.</u>)

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| *Function*: selecting a racing video simulcast corresponding to a given track | Indefinite – no corresponding structure disclosed in the patent | *Function*: selecting a racing video simulcast corresponding to a given track |
| *Structure*: a user interface that provides a display of racing video simulcasts at tracks and an input interface to make a selection of specific racing video simulcast corresponding to the given track | | *Structure*: a user interface that provides a display of racing video simulcasts at tracks and an input interface to make a selection of specific racing video simulcast corresponding to the given track |

XpressBet contends that this means-plus-function claim fails to articulate a clear corresponding structure, and thus, it is void for indefiniteness.  ODS, in response, points to language in the specifications and diagrams representing several preferred embodiments that describe a series of interconnected visual menus that users would manipulate to select a particular race simulcast.

The Court is inclined to agree with ODS that the Related Patents disclose an intelligible structure for selecting a given

race simulcast.   The patent disclosures describe a visual menu that, through the use of a cursor, would allow users to select a particular racetrack.  <u>See, e.g.</u>, '709 patent, Figs. 31, 32. Elsewhere, the patentees' describe a similar menu from which users could select a given race simulcast.  <u>See, e.g.</u>, '709 patent, 26:7-17. The Court is persuaded that a person of ordinary skill in the art would understand the references to a visual menu for selecting a particular racetrack as <u>related to</u> the menu for selecting a given simulcast, and that taken together, the Related Patent's discussion of visual menus amounts to a sufficiently definite structure.

**B.    Claim Terms for the '354 Patent**

     1.    <u>"Determining a geographic location of the user equipment"</u>

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| suitably ascertaining the physical location of the user equipment | ascertaining the geographic location of the user equipment by accessing a separate system or service to obtain location information associated with the user equipment | ascertaining the geographic location of the user equipment by accessing a separate system or service to obtain location information associated with the user equipment |

The parties' dispute whether the location verification application described in the '354 patent requires reference to some

1   "separate system or service" capable of providing information about
2 a given user's location.

3     The Court concludes that the intrinsic evidence supports
4 XpressBet's proposed construction.

5     The specification explains that the patentees' invention
6 ascertains a user's geographic location "by accessing a telephone
7 network, a relevant Internet service provider (ISP), or any other
8 suitable system or service to obtain location information
9 associated with the user equipment." '354 patent, 2:4-9.  The
10 disclosures identify GPS technology as one such "suitable system."
11 '354 patent, 21:32-34.

12     ODS maintains that the claims encompass methods of geographic
13 verification that do not require reference to an independent
14 service or system (like an ISP or a GPS network), but they make no
15 effort to explain how such methods would function.

16     Without any alternative explanation of how the patentees'
17 invention would ascertain a user's location – the invention's
18 fundamental purpose – the Court prefers to adopt the explanation
19 that the patentees' themselves articulated in the specification and
20 preferred embodiments.

21     2.   <u>"Location verification token"</u>

| ODS Construction | XpressBet Construction | Court Construction |
| --- | --- | --- |
| | | |

| a signature, key, or any suitable element that indicates that the user equipment has been determined to be in a location where wagering is allowed | a digital signature, digital key, or other electronic data that the interactive wagering system uses to verify that the user equipment is located in an area where wagering is allowed | a digital signature, digital key, or other electronic data that the interactive wagering system uses to verify that the user equipment is located in an area where wagering is allowed |
|---|---|---|

The parties dispute whether the location verification tokens that the patent disclosures describe must have some independent "content" that enables the invention to "verify" a given user's geographic location.

XpressBet offers persuasive evidence from the '354 patent's prosecution history suggesting that ODS's proposed construction fails to capture the proper claim scope. See Phillips, 415 F.3d at 1317 (explaining that claims must be construed in light of the prosecution history because it "can often inform the meaning of the claim language by demonstrating . . . whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would be otherwise"). The PTO examiner reviewing the '354 patent application required the patentees to narrow their claim in order to distinguish prior art, namely, existing tools for

1  verifying a user's location commonly known as "cookies."[6]  (See
2  Rassam Decl. Ex. K at 12-13.)

3       In documents filed with the Patent and Trademark Office
4  ("PTO"), the patentees distinguished prior art by emphasizing that
5  the location verification tokens described in the specification
6  would include "content that indicates that the user equipment is in
7  a location where wagering is allowed."  (Id., Ex. J at 5.)
8  Cookies, the patentees argued, provide no independent location
9  verification content because a given computer could receive a
10  cookie in a jurisdiction where wagering is allowed, and then be
11  moved to a jurisdiction where wagering is illegal.

12       XpressBet's proposed construction captures the limitations
13  that the patentees themselves articulated during patent
14  prosecution.  ODS's proposed construction does not acknowledge the
15  patentees' attempts to distinguish prior art, and instead contends
16  that a location verification token could be "any suitable element"
17  that identifies a user's location – a definition that on its face
18  captures the use of cookies.  Accordingly, the Court construes the
19  term, "location verification token" as referring to "a digital
20  signature, digital key, or other electronic data that the
21  interactive wagering system uses to verify that the user equipment
22  is located in an area where wagering is allowed."

23            3.   "Restricting wagering access when the user equipment
24                 does not have a valid location verification token"

25

26

---

27       [6]   Cookies are data-markers that web servers send to an
28  individual user's computer when the user's computer accesses a
     website for the first time.

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| ordinary meaning | not allowing wagering access if the user equipment does not have a valid location verification token | ordinary meaning |

    4.    <u>"Providing wagering access when the user equipment has the location verification token"</u>

| ODS Construction | XpressBet Construction | Court Construction |
|---|---|---|
| ordinary meaning | allowing access to wagering only if a valid location verification token is present on the user equipment | ordinary meaning |

    With respect to the final twSo disputed claim terms, the Court concludes that construction is unnecessary.

**VI.   CONCLUSION**

    For the reasons set forth above, the Court adopts the claim constructions described in Section V(A) and (B), above.

1  IT IS SO ORDERED.

2

3

4  Dated: September 29, 2009

5                                          DEAN D. PREGERSON

6                                          United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28